## A. J. WALKER AND JEFF BLACK v. THE STATE.

1. When the facts of a case require a knowledge on the part of the jury of the different classes or kinds of evidence, it is the duty of the court to charge them in general terms as to the distinguishing characteristics of those different kinds, and the credit which under ordinary circumstances may be placed upon evidence of either class ; but under our statute the court will not, as a general rule, be authorized to refer the jury to any particular evidence before them, and characterize it as the highest or other degree of evidence.

2. On the trial of a murder case, the court below instructed the jury that dying declarations are evidence of facts, upon the ground that " state- " ments are worthy of more credence when made under such circumstances " than if made under the sanctity of an oath duly administered accord- " ing to law ; " and then, after reciting some of the rules regulating the admissibility of dying declarations, added, " if these facts appear from " the evidence under the foregoing rules of law, it becomes the highest " testimony known, and must receive full faith and credit by the jury." This is *held* to be erroneous ; first, as being a charge upon the weight of evidence, and secondly, as raising hearsay evidence to the highest testimony known. Dying declarations are admitted in evidence as an exception to the general rule regulating the admissibility of hearsay evidence, and it is the province of the jury alone to say what credence shall be given it.

3. It is the province of a judge to say what evidence shall be admitted to the

jury; but, after it is admitted, its credibility is entirely within the province of the jury.

4. The court below instructed the jury that "an *alibi* is a species of defense "often set up in criminal cases, and one which seems to figure in this "case." *Held,* that this language was well calculated to convey to the jury the impression that the court regarded that particular defense as a pretense, without foundation in truth, and therefore is erroneous.

5. Whenever an *alibi* is pleaded in defense to a criminal prosecution, it devolves upon the defendant to establish that defense to the satisfaction of the jury.

6. When a jury in a criminal case violates Article 3070, Paschal's Digest, which prohibits them from separating during the trial, excepting under certain restrictions, their verdict should not be sustained by the court.

7. Allowing jurors in a criminal case to have access to newspapers containing imperfect or incorrect accounts of the trial will vitiate their verdict.

APPEAL from the Criminal Court of Galveston county. Tried below before the Hon. Sam. Dodge.

The defendants were indicted by the grand jury of Galveston county, for the murder of Green Butler. The facts of the case are substantially as follows: On the 19th of May, 1872, between seven and eight o'clock in the evening, while Green Butler and Joe White were standing on the gallery at Green Butler's residence, they having just stepped out from the supper table, two men rode up to the front gate of the yard around Butler's residence, and one of them asked if they could get supper. Green Butler, the deceased, replied "Certainly, light and "come in." The two men dismounted, and while they were hitching their horses to the fence near the gate, the deceased stepped off of his gallery and walked towards the gate where the men were standing; one of the men discharged a pistol and Green Butler fell; the two men then mounted their horses and rode rapidly away. Joe White, who was standing with Butler on his gallery when the parties rode up, and Mrs. Butler, the wife of the deceased, immediately went to him, and in answer to the questions, "Are you dead?" and "Who killed you?" asked him by his wife, Butler replied, "Yes, Annie, Andrew Walker "killed me; little Isham was with them;" and in answer to the

question, "Are you dead?" asked him by White, he replied, "Yes, Joe, Andrew Walker killed me; little Isham was with "them; I did not know the other or others," and then requested White to turn him over, and in a few minutes he expired. Butler was perfectly conscious up to his death, and spoke positively as to its being Andrew Walker who shot him. In a short while after Butler's death, Isham and several of the neighbors came up to Mrs. Butler's residence. It appears that Isham was camping a short distance from Butler's, and his provisions giving out, he rode up to Butler's on the evening of the killing to get something to eat, and rode his horse in between the horses of the other two men just as the pistol was discharged; his horse took fright at the discharge of the pistol, and ran away with him. For some time previous to the killing of Butler, Jeff Black and Andrew Walker had been a great distance removed from the residence of Green Butler, but had been seen in that neighborhood by several parties the evening before the killing, Andrew Walker riding his large dun horse and Black riding a sorrel horse. A few minutes before the killing, two men were seen about one mile distant from Butler's house, traveling in that direction. One of them was riding a large dun horse, which the witness recognized to be Andrew Walker's horse; the report of the pistol was heard a short while afterwards, and about the time these two men might have reached Butler's place; and immediately thereafter the witness heard the clatter of horses' feet, as the parties ran away from Butler's residence, where the homicide was committed. It also appeared in evidence, that one of the men who did the killing was riding a dun-colored horse. The defendants relied principally upon a plea of *alibi*. The killing took place between seven and eight o'clock P.M., on the 19th of May, 1872, some of the witnesses thought nearer eight than seven; the evidence introduced to establish the plea of *alibi* proved that the defendants were in camp at Summit, some seven or eight miles distant, at a quarter past eight that evening. The State proved that the same distance had been ridden, since the killing, in

twenty minutes.    There was no evidence of a previous diffi-
culty between the parties.

The defendants were convicted of murder in the first degree,
and the death penalty assessed against Andrew Walker, and
imprisonment in the penitentiary for life against Jeff Black.

The motion for a new trial being overruled, the defendants
appealed, assigning for error the instructions of the court to the
jury, and error in court below in overruling defendant's motion
for a new trial on account of misbehavior of the jury.

*Willie & Cleveland,* for the appellants.    The accused, upon
the plea of not guilty, were entitled, under the law, to the
benefit of any reasonable doubt arising upon the evidence, and
the burden of proof was at all times upon the State to show
their guilt.    The " *alibi* " which the judge in the court below
told the jury in his charge seemed " to figure somewhat in the
" case," was simply a chain of facts testified to, consisting of
references to time and place and distance, and the movements
and presence of the accused, proven as well by the witnesses
for the State as for the defense, tending to negative the conclu-
sion of their guilt.    The court below charged the jury in effect,
that by this method of defense, the burden was upon the ac-
cused to prove their innocence, to the exclusion of a reasonable
doubt.    The law is not that way.    Justice Ogden, in deliver-
ing the opinion of the court, in the case of Field *v.* The State,
34 Texas, 41, says :    " It is one of the fundamental principles of
" the criminal law of our State, that innocence is presumed until
" guilt is proven.    Under our statutes, a defendant is not compel-
" led to plead at all, nor make any defense, and yet the State
" must prove every material allegation constituting the offense."

" A defendant in a criminal case is presumed to be innocent
" until his guilt is established by legal evidence ; and in case of
" reasonable doubt as to his guilt, he is entitled to be acquitted.
" It is for the jury to determine, from all the evidence in the case,
" as well that given by the defendant as that given by the
" State, whether from the whole evidence there is such reason-

" able doubt as to the defendant's guilt, as to entitle him to an
" acquittal under this provision of the law." ° (Dorsey v. The
State, 34 Texas, 658.)

The court charged the jury :    " It is impossible to convict
" the defendants if they were at the time in another and dif-
" ferent place than the one charged in the indictment.    It is
" incumbent, however, on the defendants, in relying on this de-
" fense, to prove the same to be true.    The burden of proof
" devolves upon the defendants, and not upon the State.    If
" the defendants have adduced sufficient proof to satisfy the
" jury beyond a reasonable doubt, that on the night the alleged
" murder is charged to have been committed, they were at so
" great a distance, or the time was such as to make it impossible
" for them to have committed the crime, then, they must be
" acquitted."    The charge would have been none the less im-
perative if the court had added, " otherwise they must be con-
" victed."    This charge is subversive of the fundamental
principles of the criminal law of this State.    The accused had
plead not guilty.    They were entitled to the presumption of
innocence.    The burden of proof is always on the State, no
matter what may be the defense.    By this charge the accused
were required to prove the exact time of the commission of the
homicide, of which they were not presumed to know, if in-
nocent, as well as that at that exact time they were elsewhere.
The testimony of the witnesses for the State did not fix the
exact time of the homicide.    One witness said, " at seven
" o'clock," another, " between seven and eight o'clock," another,
" twilight," another, " just a little after dark," another, " hardly
" dark."    We put the question :    How was it possible for the
accused to prove their whereabouts at the exact time of the
homicide ?    Yet the possibility was assumed by the court, and
the positive duty imposed upon the accused to do it.    The
charge was erroneous, and cannot be supported by any authority
to be found in the law books.    The whole question as to guilt
or innocence was thus limited to the declarations of the de-
ceased, and we submit that the court, in its charge, in respect

of the dying declarations of the deceased, not only overstated the law, but went beyond its province, and trenched upon the privilege of the jury to determine the weight to be given to them.

The court charged the jury that "the declarations of a dying " man are worthy of more credence, under such circumstances, "than if made under the sanctity of an oath, duly administered " according to law." And after stating the rules which make a dying declaration admissible, the court adds :    "If these "facts appear from the evidence, under the foregoing rules of "law, it becomes the highest testimony known, and must re- "ceive full faith and credit by the jury." This charge sealed the doom of accused, Walker. It limited the jury to the dying declaration, and to that they were required to give full faith and credit, as the highest testimony known to the law, importing absolute verity. The jury had no discretion left them. This charge compelled their verdict. The charge as given is not law, and cannot be supported by any authority, from the adjudications of any courts of any civilized nation of the earth. The charge was in direct contravention of Article 3059 and 3060, Paschal's Digest, which prohibits the judge from expressing any opinion as to the weight of evidence. But granting that the judge was at liberty to express an opinion in regard to the weight of the evidence, the opinion here given is opposed to that of the best authority upon the same subject. A dying declaration is hearsay evidence, nothing more; and its admissibility is justified only by an imperative sense of public necessity. It is not entitled to the same weight as if the deceased had been sworn in open court, and given his testimony under the sanction of an oath.

It is true, the sense of approaching death is substituted for. the oath; but it needs other sanctions to bring it up to the level of testimony delivered in court. The power of cross-examination is essential to enable a jury to determine between what is stated as fact, and what is opinion ; to get at the whole truth—and that power is wanting. So, too, the fear of punishment for perjury, if a false statement be made, is with-

drawn.   This question is well considered in the case of Lambeth *v.* The State, 1 Cushman, Miss. R., page 358 *et seq.*; and again in Brown *v.* The State, 3 George, Miss. R., 433.

In the case of Lambeth *v.* The State, 1 Cushman, 23 Miss. R., 358, the court below charged the jury that " the dying " declarations of Tate, written by the witness Simms and offered " in evidence, are entitled to the same credit and force before " the jury as if the statements had been regularly sworn to, in " court, before the jury." Justice Yerger, in delivering the opinion of the court, says :   " But in our opinion the ninth " instruction was erroneous, because the language was calculated " to mislead the jury, in respect to Tate's declarations, which, " under any circumstances, are at least but hearsay testimony, " and subject to the objections which apply to 'that kind of " evidence ;   nothing but an imperative sense of public ne- " cessity ever justified their ' admission.    Hence, the courts " constantly declare that they should be received with great " caution.   It is true some authorities lay down the rule that ' a " ' sense of impending death is equivalent to the sanction of an " ' oath ; and that the persons whose statements are thus ad- " ' mitted, are considered as standing in the same situation as if " ' they were sworn.'    In thus laying down the rule, nothing " further was intended by the writers than to assert the ordi- " nary principle of the law on this subject, to wit : that for the " purpose of admitting these statements for the consideration " of a jury, the law substitutes the situation of the party " making them, in lieu of the oath which is usually required, " and so renders the evidence competent.   But the degree of " weight ' or force to be given to such statements are left for " the consideration of the jury, and depends upon a variety of " circumstances which may tend to increase or diminish them. " Among these circumstances, are the mental and physical con- " dition of the deceased when the declarations were made ; his " memory, the extent to which disease may have impaired his " recollection, and the accuracy with which the witness, who " testifies to the declarations, repeats the language used by the

." deceased.   When statements are regularly sworn to in court
" before a jury, there are methods by which the jury can test
" the truth or falsehood of the statements, which cannot be ap-
" plied by them to testimony given in any other way.   Hence,
" the provision before referred to, in the bill of rights, that the
" accused shall be confronted with his witnesses.   In addition
" to the solemn sanction of the oath administered to the wit-
" ness, and which impresses him with the necessity of speak-
" ing the truth, as he will be hereafter held to account for it,
" there is the salutary and restraining fear of punishment for
" perjury, if a false statement be made ; and when the witness
" is thus confronted with the accused before the jury, the ac-
" cused has the power of cross-examination, a power as
" esssential to the eliciting of truth, as the sanction of an oath
" itself, as thereby an opportunity is afforded to ascertain
" facts, omitted in the statement, which may be essentially
" important to the truth of the narrative. (1 Greenleaf on Ev.,
" Section 162 ; 2 Pothier on Ob., 255 [Mr. Evans' note] ; 2
" Starkie on Ev., 263.)   At the same time, from a personal
" observation of the witness, from his manner of testifying,
" from his willingness or unwillingness to answer questions,
" from the clearness of his statements or the hesitancy with
" which he speaks, the jury is called to judge of the truth of
" his statements.   If, then, the court, by the ninth instruction,
" intended to charge the jury that the same weight and force
" were to be given to Tate's statement as if Tate himself had
" been a witness in the court, it was certainly erroneous.

" But the instruction, in our opinion, is objectionable in an-
" other point of view.   The jury is directed to give to the state-
" ment of Tate, written by Simms, the same degree, weight,
" and force, as if it had been made directly by Tate in their
" presence ; thus giving to secondary evidence the same weight
" which is due to direct testimony.   Although the witness
" Simms intended to communicate accurately the statements
" made to him by Tate, and the circumstances under which
" they were made, it is impossible for him to communicate the

" tone and manner of Tate in making these statements.   It is
" impossible for the witness to do more than convey to the jury
" the impression made on his own mind at the time.   Every
" day's experience teaches us that we cannot and ought not to
" rely with the same confidence upon what is communicated to
" us, as upon those things we see and hear ourselves; nor are
" such statements entitled to the same weight and force; how-
" ever anxious the informant may be to communicate what he
" has seen and heard he can only give the impressions that
" were made upon his own mind; and if, from any cause, that
" impression is inaccurate, is incorrect, he will of course make
" an inaccurate and false impression upon the mind of the party
" to whom the communication is addressed.   We do not think,
" therefore, that Tate's statements, written out and offered in
" evidence by Simms, were entitled to the same weight as if
" Tate had been regularly sworn in court before the jury ; be-
" cause, in the latter case, the jury could have judged for them-
" selves by personal observation, in relation to Tate's mental
" and physical condition, how much his mind had been affected
" by his wounds and his impending death ; to what extent his
" memory and recollection had been impaired thereby; how
" far the passion of anger or feelings of revenge operated upon
" his mind and affected the truth and accuracy of his state-
" ments.   In short, they could have decided in regard to these
" things, by the impression which would have been made upon
" their minds; and not made mediately upon them by informa-
" tion derived from another.   It is, therefore, our opinion that
" the statement of Tate, if sworn to regularly in court, before
" the jury, would have been entitled to greater weight and
" force than when communicated to them by the witness Simms.
" Let the judgment be reversed, and new trial granted, and
" the cause remanded."   (See also 17 Illinois R., 17; 1 Green-
leaf on Ev., Section 160, 161, 162; 2 Starkie on Ev., 366, 367.)

But it may be replied that the charge given at the instance of
the accused cured this error in the judge's charge.   Not so.
The charges were irreconcilable.   The one directly antagonistic

to the other. It is the duty of the judge to enlighten, not confound—to declare the law with certainty. The charge must be correct, and must be consistent; and if not so, but contradictory, that alone is good cause for new trial. (3 Graham & Waterman on New Trials, 800.)

The separation of the jury is fatal to the verdict, and a new trial should be awarded for that error. (Paschal's Digest, Article 3070.) In Woods v. The State (1 Morris, 43 Miss. R., p. 364), Peyton, C. J., says: "It is of the utmost importance to the " administration of justice that the purity of the trial by jury " shall be preserved; and time and experience have shown the " wisdom of the common law, which forbids the separation of " the jury in the trial of a capital case before they have been " discharged of the prisoner, and an adherence to which, modi-" fied as it has been in some of its harsh features by modern " practice, is best calculated to effect that end. For, if de-" partures were allowed from this rule, it is not too much to " say that few influential culprits would ever be convicted, " and that few friendless ones, pursued by powerful prosecu-" tors, would escape conviction. Jurors are as open to preju-" dice from persuasion as other men, and neither convenience, " comfort, nor economy ought to be consulted to guard against " it. The stream of criminal justice should be kept as pure as " possible, and not be thus exposed to the chances of pollution " from extraneous influences."

In the case of Hare v. The State (4 How., Miss. R., 187), Chief Justice Sharkey says: "If the verdict be given under " circumstances which might conduce to an improper influ-" ence, or the natural tendency of which might be to produce " bias or corruption, it cannot then be said to be above suspi-" cion; and if it be not, it must fall short of that perfection " which the law requires, and which, under a more guarded " administration, it is capable of producing. It is not necessary " that an attempt should be made to bias the minds of the ju-" rors, or that any pernicious influence should be exerted. The " door to tampering is to be closed. This is the only security.

" For, if left open, it may be predicted with certainty that the " evil consequences will fall somewhere."

" If the purity of the verdict might have been affected, it " must be set aside. A verdict on which doubts might rest, " cannot be good. It must command entire confidence; and " this is the doctrine of The Commonwealth v. McCaul, 1 " Virginia Cases, 271, and McLean v. The State, 10 Yerger; " Peiffer v. The Commonwealth, 15 Penn. R., 468 ; The State " v. Hornsby, 8 Rob., 554 ; The State v. Populus, 12 La. Ann. " R., 710 ; Westley v. The State, 11 Humphrey, 502 ; Wiley " v. The State, 1 Swan, 256 ; The People v. Backus, 5 Cali- " fornia, 272 ; McQuillen v. The State, 8 S. & M., 596 ; Or- " gan v. The State, 26 Miss., 83. Nor will the court permit " a collateral issue with respect to the question of improper " influence, or tampering with the jury. The affidavits of " jurors would not aid in arriving at the matter embodied in " such an issue. In the case of Wood v. The State, 43 Miss., " the court say : No person can know what the communica- " tions were but the parties themselves, between whom they " are made ; and a judicial investigation into these communi- " cations, which are in themselves a violation of law, would " inspire a desire, not only to avoid these penal consequences, " but to maintain the character of good citizens, by making " it appear that they had no influence upon the mind of the " jurors in the trial of the case. Testimony derived from such " sources would be entitled to but little credence, and certainly " could not form a reliable basis for the intelligent action of a " court, in a case involving the momentous issues of life and " death."' Better adhere to the rule of the code, which for- bids separation, than to be involved in the collateral inquiry as to the effect produced thereby, which no one could know except the derelict juror, and which, if untold, would remain a secret forever.

And more than this, the jury did not only separate, but from day to day pending the trial were suffered to read newspapers containing partial and imperfect reports of the testimony, and

biased comments thereon.   No case can be found where such irregularities have occurred, much less been sanctioned.   This method of tampering with the jury is not to be tolerated; and is as liable to objection as if the jurors were personally approached, and communication and conversation had by the writer with them.   (Graham & Waterman, Vol. II., page 486; 2 Sumner, R., page 19.)   The law of Forty-second Congress, pamphlet page 408, is salutary on this head.

So far the appeal has been considered with respect to both defendants; and for the errors shown, the case should be reversed and the cause remanded.  We add, however, that upon the evidence, even considered in the light of the erroneous charges, the jury should have acquitted the defendant Black.   In the case of The State v. Burrell, 18 Texas, 714, the evidence showed that Burns was present at the time of the homicide, and still it was held that " it must be proved that he was aware " of the intention of his companion, and participated in it." It will not be pretended that there was any proof whatever to connect Black with the homicide; not in the declaration of the deceased, nor by any other testimony.   The prosecution linked the defendants together, in order that Andrew J. Walker, who alone was to be affected by the declaration of the deceased, should be deprived of the testimony of his companion, who was with him on the 19th of May, and who alone could know, with respect to what the court below required the defendants to prove, that at all times between sunset and midnight of the 19th of May, they were elsewhere than the place of the commission of the homicide.

*McLemore & Hume* and *Flournoy & Sherwood*, for the State. We submit that the substance of the complaint of appellants is that the honorable judge in the court below has uttered particular sentences and has expressed particular views of the law which this court should now reform and correct; not for the purpose of attaining the ends of justice in the case before the honorable court, but because, forsooth, there may be irregulari-

ties in the sentences complained of, and, at 'most, that the honorable judge of the court below may have expressed himself with greater emphasis in stating the law than he should be allowed to do, even if what he has said or done have nothing to do with the verdict in the particular case.

We submit that unless this court believe that the verdict of the jury was controlled or affected materially by the instructions of the court below, and against the law as applicable to the facts of this case, that no notice will be taken of such instructions, and the verdict will be allowed to stand.

First, then, they complain of the language used by the court below in reference to the solemn character of dying declarations, when they are admitted under the statutory rules.

Suppose the court did, in the enthusiasm of a writer impressed with the peculiar sanctity that ought to attach to what a man says who is about to take his leave of earth and all that is dear to him, and with the awful thought of the scene that awaits him before his high God that should impel the speaker to tell the truth—suppose, we say, that the court should use language that placed such declarations so made upon the highest plane of testimony, was there anything in this case that would render such language or such sentiments obnoxious to complaint? The most that was said, or that can be said on the subject of testimony of this character, is that the jury are to receive it as if it were accredited to them as competent evidence; and the court below could not have said anything in reference to the dying declarations of Green Butler, that could have made the jury consider the same as entitled to more weight than they would have been obliged to give to it without anything having been said.

The declarations were admitted because they were admissible under the law; they were communicated as having been made by three different witnesses, and in a manner as to place beyond question the fact that such as they were represented to have been, they really were; and the character of Green Butler was not questioned in any manner whatever, so that the

jury must have believed that Green Butler did use the language accredited to him, and that he believed that he was telling the truth; and that whatever the court might have said, could not make them do more or other than they were obliged to do.

The jury were obliged to believe that the declarations were made (without any charge of the court), and they were not required to do more by the charge; and the jury were obliged to believe that Green Butler said in his dying declarations that which he believed to be true, and the charge did not require them to do more. And if this honorable court will inspect the record, as we know it will, it must be seen that under the dying declarations, admitted, as they were, and sworn to, as they were, the jury could not have done otherwise than to know that Green Butler saw Andrew Walker when he delivered the fatal shot that terminated in the death of said Butler. Green Butler had no opinion as to who shot him, but he saw the man who did the shooting, and he saw "little Isham" with him. There might have been room for discussion as to whether Green Butler was announcing his mental conclusion as to who shot him rather than telling what he saw, if the scene that he drew did not manifestly show that he, Butler, was describing that which his eyes had witnessed and about which he was not fancying. He says, "Andrew Walker killed me, "and little Isham was with him."

Can this court doubt but that Butler spoke of what he saw, and not about that which he might have been thinking? Little Isham was no companion of Walker's; he had no business to be with him, but belonged to a different gang of men, and to those who were working with Butler himself; and hence Butler would not have thought of Isham had he not beheld him with his eyes; and unless, therefore, this court believe that this charge, about which there is so much complaint, was calculated to influence the jury beyond the force that was necessary to their finding from the evidence itself, we submit that on authority it will not disturb the verdict on account of such matter in the charge. (See Texas Reports, Vol. II., page 285;

Vol. XXI., page 752; Vol. XXIII. page 453; Vol. XXVII., page 764; Graham & Waterman on New Trials, pages 263, 316, and 513.)

And as to the opinion of law writers on the subject of the value of dying declarations, we submit that the case at bar should not be controlled by any view in which the privilege of cross-examination is made to be of considerable importance, because the most that could have been made by cross-examination of Green Butler, had he lived, would have been to inquire as to how he knew that it was Andrew Walker that shot him; and this question answers itself, because we know that he knew the fact from the trust that he placed in the veracity of his eyesight; and that inasmuch as he is shown to have been correct in saying that he saw Isham, for the same reason must we believe, if for no other, that he saw Andrew Walker. And all of the writers admit that the obligations to tell the truth is equal, if not greater, on one who is dying, and is conscious of it, as upon him who testifies under oath. (See Greenleaf on Evidence, Vol. I., Sections 160, 161, 162; Wharton's Criminal Law, 671, 292, 497; and Roscoe's Criminal Evidence on Dying Declarations.)

So that in no sense as applied to this case did the court below err in its charge to the jury.

But above all things does the charge and charges given by the court at the request of the appellants (then defendants) estop them from complaining. Because the entire meaning of the court is made to fully appear in the charges that were given as asked, and the jury could not have been misled when the explanations were so full; and these explanations did not involve any contradictions such as the appellants now complain of. (See Graham & Waterman, Vol. III., page 800.)

On the contrary, the charge as a whole is consistent and intelligible, and really gave the law as to the dying declarations and their weight, exactly as the law should be expounded and as defendants then asked.

(See as to commenting on weight of evidence, Greenleaf's

Evidence, Vol. II., pp. 160, 161, 162; 1 Cushman, 358; Ala. Rep., Vol. XII., 76.)

Greater complaint is made at the charge of the court that was given in reference to the burden of proof on the *alibi*, than anything else perhaps, and we think with less reason.

The argument that is made here is upon a state of case that does not exist.

The court did not charge that the burden of proof was not upon the State to establish the guilt of the accused as charged. The charge was given as applicable to the case as practically conducted, in this way, to wit: The State had made out its case under the dying declarations and the proof that the parties were around the place of the murder, both before and after the murder, and the case was so made out as that there was no possibility of escape from it unless the accused could show that they were at the time of the alleged murder at some other place, and therefore, that they could not have committed the deed.

The accused rested their defense on their undertaking to prove an *alibi*, and so announced to the court and jury, as their counsel were entitled to do, and as their duty was to do. It is true that they had pleaded "not guilty," and that under this plea they could have shown their " *alibi*." And the charge that the court gave was in substance, that it did not devolve upon the State to show that these defendants were not elsewhere at the time of the murder, on account of the plea of an *alibi*, that had been made by the accused, but that it was the right of the State *to* establish in any manner the guilt of the accused, and that if the accused desired to rely on any fact in order to show that the case as made by the State was not a good one, they, the accused, must satisfy the jury of the truth of such a fact by evidence that would convince them beyond a reasonable doubt.

Exactly as if they had pleaded insanity at the time of the commission of the offense, or rather, as if they had undertaken to show insanity at the time of the commission of the offense

(which we think they could have approached nearer if they had undertaken it), unquestionably the court would have charged that the burden. of proof was upon the accused to satisfy the jury beyond a reasonable doubt of such a fact, and so of this " *alibi*." The State had shown that Walker and Black had done this killing and murder, which involved the necessity of their being at the place, and the defense set up and relied upon was, that the two (three) were together at some other place, and which they undertook to show. How? By showing that it was possible for them to have been at some other place, but not in the least probable or reasonable. No, they must show that fact like any other, and that is, by satisfying the jury of the reasonable probability that such fact was true. The whole charge shows that the burden was upon the State to prove the guilt of the accused beyond a reasonable doubt, and if the jury had entertained the slightest doubt as to whether Walker and Black were at the place, they would have found them not guilty, and this court know it.

The jury were instructed, that if there was any reasonable doubt as to the guilt of the accused, they should acquit, and they would have done so had there existed any such doubt. If the jury had doubted at all as to the whereabouts of these parties at the time of the killing, how could they have found a verdict of " guilty " ?

The truth is, the charge was not at all necessary to protect the cause of justice, as involved in the case, because the jury could not have had the least difficulty in getting over the " *alibi*," from the fact that not a shadow of such a condition of things was reflected upon the case by the testimony in the case.

The court charged the law. (See Texas Reports, Vol. XII., pp. 504 and 532, and Wharton's Criminal Law, p. 707 *et seq.*)

The question of the separation of the jury and the danger to society, we submit, is undertaken to be availed of as a fact when such is not the case, and as the court below well knew. (See as to what separation of the jury is to be considered, Texas

Reports, Vol. XXXII., p. 75; Vol. XXVII., p. 769; Vol. XXVI., p. 1; Vol. III., p. 34. Illinois Reports, Vol. XXI., p. 410. Grattan, Vol. XIX., p. 485. Graham & Waterman, p. 85 *et seq.* Wharton's Criminal Law, p. 3137.) So that even if there were anything in the record to justify comment on this subject at all, the authorities show that nothing has transpired in these proceedings that would warrant a reversal.

The question of venue was one of fact for the jury, and we submit that the conduct of the case to this court without any such question having been raised, must or should satisfy this court, that the jury did find according to the evidence before them that the offense was committed in Galveston county.

The bill charges the fact, and after indictment found an order was had and made by consent of the accused, addressed to the surveyor of the county, to plot the ground, including the premises of the late Green Butler, where the offense was alleged to have been committed, and in Galveston county, and the plot was made by said surveyor and returned to the court, and was used in evidence, and is now before this court.

And the witnesses sufficiently identified the place in Galveston county, to warrant this court in sustaining the verdict.

Besides, we think that this court is not called upon to look into the record for such matter at this stage of proceedings, because there is no showing before the court that this matter has ever been the subject of difference heretofore, and the fact must be that the offense was committed in Galveston county, or the same would have been at issue heretofore. The truth being, that such fact was abundantly shown and admitted by the acts and words of accused. And the brief before us, submitted by accused through their counsel, raises no such question, and we refer to it only because it has been submitted to the members of your honorable court on the application for right of appeal.

As to the guilt of Jeff Black, there can be no more question than about Andrew Walker. The evidence was conclusive that the two were together before and after the murder, and

they claimed on the trial that they were together at the time of the murder, and if so, it cannot be otherwise than that Jeff Black at least knew that Andrew Walker had committed the offense, and if so, he became a principal, in contemplation of law and as charged in the indictment, by running away with Walker, and by persisting in concealing the knowledge of the murder, even to the time of the trial, and by allowing himself to be tried with the said murderer. And it cannot be conceived how it could be that one who has acted like Black since the murder, could have been other than a party to the planning of the murderous act of Walker, and fully imbued with the murderous intent of Walker.

This will not do for Black; he must have been the murderer of Butler with Walker, if he were present at the time of the murder, and of this there is no question.

If the court will look into the statement of facts—although the facts are greatly modified from the same, as they were from the mouths of the witnesses—it must be observed, that there is abundantly shown that Andrew Walker and Jeff Black did commit the murder of which they have been convicted, and the effort is now made, by able and ingenious counsel, to secure a reversal on grounds that should not commend themselves to this court.

As representatives of the State, we are not disposed to ask that the life of one citizen and the liberty of another be taken without regard to a due observance of the essential forms of the law, yet we do insist that the courts of the country were not intended to be used as agencies in the hands of criminals, or their lawyers, in order to defeat, by mere management, the manifest ends of justice.

OGDEN, J. On the 30th day of July, 1872, the appellants were tried before the Criminal Court for Galveston county, for the murder of Green Butler, and were convicted. Their motion for a new trial was overruled, and they have appealed and have assigned several errors for the reversal of the judg-

ment, which refer more directly to the charge of the court, and the conduct of the jurors during the progress of the trial.

We do not propose to notice the assignments in their numerical order, but only such questions as are considered material to the proper disposition of the case now before us. Appellants complain that the charge of the court is in disregard of the statute which says, the court "shall in no case, civil or "criminal, charge or comment on the weight of evidence." It is very proper and right for the court, where the facts of a case require a knowledge on the part of the jury of the different classes or kinds of evidence as recognized by legal authority, to clearly point out, in general terms in the charge, the distinguishing characteristic of those different kinds, and the credit which, under ordinary circumstances, may be placed upon evidence of either class. Thus, we think the court, under the statute, fully authorized to explain to the jury the difference between primary, secondary, hearsay, and presumptive evidence, and the relative amount of conviction each class should, under ordinary circumstances, produce upon the mind. But it is believed that, under our statute, the court would not, as a general rule, be authorized to refer the minds of the jury to any particular evidence adduced upon the trial of a case, and then characterize it as the highest, or lowest, or any other degree of evidence. It is the province and duty of the court to determine what evidence shall be admitted to the jury; but when once admitted as legitimate testimony, it is then the exclusive right and privilege of the jury to determine the weight it shall have in the formation of their verdict. And when the court, by inadvertency or otherwise, has, in the charge to the jury, placed greater stress or weight upon one portion of the testimony legitimately before them, than another, it trenches upon the province of the jury and the positive requirements of the statute.

The court charged the jury that the declarations of a dying man have from time immemorial been conceded to be evidence of facts, upon the ground that "his statements are worthy of

" more credence, under such circumstances, than if made under " the sanctity of an oath, duly administered according to law." And after stating the rules which determine the admissibility of dying declarations, the court further charges the jury : " If " these facts appear from the evidence, under the foregoing " rules of law, it becomes the highest testimony known, and " must receive full faith and credit by the jury." We think this clause of the charge clearly erroneous, for two reasons. It is a direct and special charge and comment upon the weight of evidence, which is positively prohibited by the statute (Paschal's Digest, 1464 and 3059), and, under the testimony adduced on the trial, left the jury no alternative but to find at least one of the defendants guilty. The declarations of the deceased were clearly proven by several witnesses, who were wholly uncontradicted, and the charge makes those declarations the highest testimony known, and therefore absolutely conclu-. sive. There could be no allowance for a possible mistake in the deceased ; no consideration of the probability that, in the very article of death, he might have been bereft of reason or memory ; and no doubt that the witnesses who repeated his last words did so with absolute precision and truthfulness.

We think the charges here cited are clearly erroneous, because they raise hearsay evidence to the highest testimony known. This is in conflict with the clearly enunciated rule laid down by every writer on evidence to which we have had access, and contrary to the reason for the admission of proof to establish any fact. Dying declarations are admitted as evidence under an exception to the general rule, which is founded upon public necessity, and not because they are more worthy of credence than other testimony. They are admitted under restrictions, and when so admitted, they are raised to the character of other evidence, which may, or may not, have great weight, according to the circumstances under which they were made ; and it is for the jury, and not the court, to judge of those circumstances, and the credence to be given to those declarations.

Mr. Greenleaf says, it is the province of the judge to deter-

mine whether those declarations are admissible, "but, after the "evidence is admitted, its credibility is entirely within the "province of the jury, who, of course, are at liberty to weigh all "the circumstances under which the declarations were made, "and to give the testimony only such credit as upon the whole "they may think it deserves." (Greenleaf's Evidence, Vol. I., 185. See also Lambeth v. The State, 1 Cushman, 23; Starkie on Evidence, 462.) These authorities .lay down a different rule from the one enunciated in the charge of the court, and one which we feel called upon to follow, in deciding that the court erred in its charge to the jury. We are also of the opinion that the erroneous charge here noticed was well calculated to mislead the jury, and may have done so ; and that the appellants are therefore entitled to another trial by a jury properly instructed by the court.

We do not think the charge given at the request of appellants' counsel can be considered as correcting the erroneous charge already given, as the one charge contradicts the other, and in any event tended to confuse the jury. We think the appellants entitled to a definite, clear, and harmonious charge of the law, applicable to the facts as proven on the trial ; and failing to get such a charge, we think they had a right to complain.

Appellants also complain of that portion of the charge of the court which informed the jury, that "an *alibi* is a species "of defense often set up in criminal cases, and one which seems "to figure somewhat in this." It is believed that this portion of the learned judge's charge, as well as others heretofore referred to, were the result of haste and excitement, which almost always attend trials for offenses of so grave a character as the one now under consideration. But it is the duty of the appellate court to act with more deliberation, and correct such errors whenever they may occur. The peculiar language of the charge in regard to the defense of an *alibi* is well calculated to convey to the minds of the jury the impression that the court regarded that particular defense as a pretense without

much foundation in truth. While it is true that the defense of an *alibi* is often set up without the foundation of truth, and as a pretext to shield the guilty where no other defense could be claimed; but, says Bouvier, "if it appears to be founded in " truth, it is the best negative evidence that can be offered ; it " is really positive evidence which, in the nature of things, " implies a negative, and in many cases it is the only evidence " which an innocent man can offer." We think that whenever this defense is set up to an accusation, and especially to so grave a charge as the one of which the appellants are accused, it demands a patient, careful, but scrutinizing examination by both court and jury. But we are clearly of the opinion that, when a defense of this character is attempted to be set up, it devolves upon the defendant to prove that defense to the satisfaction of the jury, if he expects to be benefited thereby. When the prosecution has made out a case of guilt beyond a reasonable doubt, the burden of proof is then changed, and it devolves upon the defendant to establish his innocence by proof.

We are further of the opinion, that the affidavits filed in this case show, beyond controversy, that the jury were permitted to violate the positive injunction of the law, " that they shall " not separate during the trial, unless by permission of the " court, with the consent of the district attorney and defend- " ant, and in charge of an officer." (Paschal's Digest, 3070.) The wisdom of a law like ours, to preserve the purity of trials by jury, is fully acknowledged and appreciated by every person who has given the subject any mature deliberation. The liability of jurors to improper influence, when vital interests are committed to their decision, renders a law of the character referred to, absolutely imperative. But our statute declares that a jury shall not separate during a trial, excepting under certain restrictions, and if they violate the law in that respect, their verdicts should not be regarded by the court as an unbiased and honest verdict, entitled to respect and support. The law not only prohibits the separation of the jury on the

trial of a felony, but it also prohibits any communications with the jury after they have been impanneled to try a criminal action, excepting in the presence and by the permission of the court. It is then the duty of the court to see that the jurors are not tampered with, or attempted to be influenced by any person, excepting in the manner pointed out by law. The suffering jurors to have, during the progress of the trial, daily access to newspapers containing imperfect or incorrect accounts of the trial being had before them, together with comments upon the person and characters of those connected with the trial, was certainly erroneous and improper, and of itself sufficient to vitiate the verdict rendered by them. For the reasons given, the judgment is reversed, and the cause remanded.

Reversed and remanded.