## West Chicago St. R. R. Co. v. Emma Grenell, by Her Next Friend.

1. NEW TRIALS—*Reading by Jurors of Newspaper Articles Prejudicial to One of the Parties.*—It is well settled that the reading by jurors of newspaper articles prejudicial to one of the parties litigant is cause for a new trial.

2. EVIDENCE—*Exhibition of Mutilated Limbs to the Jury.*—In a trial for personal injuries, it is not error to permit the party suing to exhibit his mutilated limbs to the jury.

**Action on the Case,** for personal injuries. Appeal from the Circuit Court of Cook County; the Hon. ABNER SMITH, Judge, presiding. Heard in this court at the October term, 1899. Reversed and remanded. Opinion filed June 21, 1900.

**Statement.**—Emma Grenell, a minor, by her next friend, sued appellant in case for an injury to her person, and recovered a verdict for $20,000. On motion by appellant for a new trial, the court required appellee to remit $5,000 from the verdict as a condition of overruling the motion, which appellee did, and judgment was rendered for the balance, $15,000. Appellant has two street car tracks on Western avenue in the city of Chicago, on which it operates cars moved by electricity. Western avenue is a north and south street, and the east track of appellant is the north bound track, and the west track the south-bound track. Appellee at the time of the injury complained of, was between six and seven years of age, and lived with her mother, whose residence was on the east side of Western avenue between Harvard and Polk streets, which streets lie east and west across Western avenue.

Between six and seven o'clock in the evening of October 31, 1895, appellee, while crossing from the west side of Western avenue to her mother's house on the east side of the street, was struck by a north-bound electric car of appellant, and was seriously and permanently injured.

The contention of appellant, which its counsel claim is supported by the evidence, is " that the car was going at a reasonable rate of speed, and that the child ran out from

behind a south-bound car, which hid her from view until too late to avoid the accident." The contention of counsel for appellee is, " that the car was being operated at an excessive rate of speed; that the motorman's view of the child was unobstructed, and that, had he maintained a proper lookout, he would have discovered the child and have avoided the accident."

The trial commenced March 16th, and continued until March 24, 1899, at which last date the verdict was rendered. During the progress of the trial the jury were permitted to separate daily in the evening, when court adjourned. March 20, 1899, while the trial was progressing, appellant presented and read to the court an affidavit which is as follows :

" George A. Yuille, being first duly sworn, on oath deposes and says that he is second vice-president of the defendant company, and that he is the agent of the defendant company in this behalf. That on Friday morning, March 17, A. D. 1899, the following article was published in the daily newspaper known as The Chicago Record :

'KNOCK DOWN BRIBERS.

'Strange Advice to a Jury.   Counsel Richolson for the West Chicago Street Railroad Company Speaks of the Corruption in the Emma Grenell Damage Suit.

' Emma Grenell, whose suit to recover damages from the West Chicago Street Railroad Company was balked by the jury-bribing work of bailiff Jas. J. Lynch, according to the confession of the jurors, is to be given another chance for justice. A new trial of the case was begun yesterday before Judge Smith, and the opening argument will be made to the jury to-day by Jas. C. McShane, who is associated with Russell M. Wing as counsel for the plaintiff.

'At the conclusion of the selecting of the jury yesterday Attorney Richolson, who has succeeded Alex. Sullivan as general trial lawyer for the defendant company, warned the jurors that they must be careful not to be improperly influenced, and advised them to knock down any one who attempted to offer a bribe.

'PERSONNEL OF THE PANEL.

'The jury is composed as follows:

'Harry V. Culp, credit man for Phelps, Dodge & Palmer; lives at 343 Marshfield avenue.

'Charles Tiley, farmer, of Tinley Park.

'Peter Corbeley, retired business man; lives at 122 Loomis street.

'Louis H. Gellert, plumber; lives at 800 Maplewood avenue.

'Chas. J. Forsberg, salesman for Cable Piano Co.; lives at 5928 Cedar street, Austin.

'E. Anderson, insurance man; lives at 1045 Fairmount avenue.

'Christopher Bollinger, restaurant-keeper, at 1337 W. Madison street.

'H. F. Hoffman, farmer; lives in Barrington township.

'Frank Condon, grocery clerk; lives at 1210 W. Madison street.

'Thos. Bernsten, cooper; lives at 21 Austin avenue.

'Thos. Ellickson, sawyer; lives at 654 14th place.

'Wm. B. Genecke, farmer; lives near Elgin.

### 'HOW EMMA GRENELL WAS HURT.

'Emma Grenell was knocked down and run over on the evening of October 31, 1895, in front of her home, at 430 Western avenue. She was frightfully mangled, an arm and part of one foot being cut off. She is now unable to dress or undress herself, or to do anything requiring the use of hands, having only a thumb and forefinger on one hand. At the former trial, which occurred before Judge Hanecy in May, 1898, it was shown that the motorman was inexperienced and could not stop the car in time to avoid the accident. Two of the jurors, Frank S. O'Brien of 3645 Hamilton avenue, and Jas. Kenney of 643 W. Fifty-sixth street, confessed to State's Attorney Deneen that they had been bribed by Lynch to 'hang' the jury in favor of the company. According to the confessions, O'Brien was paid $100 and Kenney $50, though the latter complains he was promised $75. Both men are now under bond for their appearance in court.'

"That on Saturday morning, March 18, A. D. 1899, the following article was published in said 'Record:'"

### 'GRENELL TRIAL OPENS.

'Was the Company Careless? Corporation's Lawyer Argues that the Child Should Not Have Been Allowed in the Street—Car Running Thirty Miles an Hour.

'Surrounded by relatives and friends, little Emma Grenell sat all day yesterday in Judge Smith's court room and watched the trial that is to determine the amount of dam-

West Chicago St. R. R. Co. v. Grenell.

ages she is to receive from the West Chicago Street Railroad Company. Beside her were her mother, Mrs. C. Grenell, her grandmother, Mrs. W. M. Colwell, and her uncle, A. H. Colwell. (Pictures of Emma Grenell, her uncle, mother and grandmother; also Conductor Olson.)

'Attorney McShane opened the case by a brief address outlining to the jury the circumstances of the accident and the claim of the plaintiff that the car was running at an unusually high rate of speed.

#### ' WAS THE COMPANY CARELESS ?

' There is practically but one question involved," he said in part. " Did the company operate the car with reasonable care ? We contend it did not use the care necessary to secure protection to so young a child."

' Attorney E. Parmelee Prentice in his argument for the company declared that so young a child ought to have exercised sufficient care to have kept her from getting in front of the car, and that if she could not exercise such care she ought not to have been allowed in the street.

' The principal witness of the day was Henry B. Olson, the conductor of the car, who swore that it was late and running at the rate of thirty miles an hour, and that it did not stop at the Harvard street crossing, where a passenger was waiting. H. M. Anderson, whose home is in Harvard street, near the corner of Western avenue, told the jury that he was the man waiting, and that the car did not stop, though he signaled it to do so.

#### ' SAW THE CHILD STRUCK.

' Mrs. M. J. Foute testified to having seen little Emma struck by the car while looking out of a window. Her evidence was corroborated by that of Harvey L. Hull, who was standing in a doorway near by when the accident occurred. Mrs. Mattie McKey, a nurse, told of the child's condition when brought into the Presbyterian hospital, and said it was thought most remarkable that she survived. The case will be continued Monday morning.'

" That the said ' Chicago Record ' is a newspaper of general circulation, printed and published in the city of Chicago, Illinois, in the English language; that it is very generally seen and read throughout the said city of Chicago, and that articles published therein necessarily attract the attention of and become known to persons concerned in the subject-matter mentioned, and to many other persons; that at once upon the publication of the said articles they were

seen by this affiant, by several persons concerned with the defendant company who have mentioned them to this affiant, and commented upon the contents thereof, and by a large number of persons having no interest in the above entitled suit, but who, knowing that this affiant was an officer of said defendant company, or for other reasons, mentioned the said articles to this affiant.

"That there was also published in the said ' Record ' for March 18th, and for March 17th, the following statement of the circulation of the said paper during the month of February, A. D. 1899 :

' SUNDAY, March 18, 1899.

FEBRUARY CIRCULATION.

' STATE OF ILLINOIS, } ss.
' County of Cook, }

' Victor F. Lawson, publisher of The Chicago Record, does solemnly swear that the actual number of copies of the paper named, printed and sold during the month of February, A. D. 1889, was as follows : ' (Here follows a list showing the circulation for each day in February, and the daily average of sales of the paper, such daily average being 162,469.)

' All "exchanges," copies used by employes, unsold or returned papers are omitted from the claimed circulation.

' VICTOR F. LAWSON.

' Subscribed and sworn to before me this 28th day of February, A. D. 1899.

'SAMUEL R. WELLS,
[L. S.]                     'Notary Public.

'The Advertisers' Guarantee Company of Chicago hereby certifies that it has by its expert examiners proven and attested the above figures as to circulation of The Chicago Record to be correct, and that the daily average paid circulation for the month of February was as above stated, 162,469 copies. This is guaranteed to advertisers of the country by a bond of $50,000 in the Fidelity & Deposit Co. of Maryland, deposited with the Northwestern National Bank of Chicago.

' ADVERTISERS' GUARANTEE CO.
'By J. R. MASON, President.'

"That affiant has read the foregoing statement as to the circulation and believes that the figures therein given are substantially correct, and that the affidavit of said Victor F. Lawson and the certificate of the Advertisers' Guarantee Company are true.

"Affiant further says that he saw the article above set forth which appeared in 'The Chicago Record' on the morning of the 17th of March, very shortly before the opening of court on that day; that upon the said morning court met at half past nine o'clock; that affiant had no opportunity before that time to consult with counsel representing said defendant company in the case, or with other officers of said company in regard to the said publication.

"Affiant further says that on the evening of Friday, March 17th, A. D. 1899, there appeared in the five o'clock edition of the newspaper known as 'The Chicago Daily News' the following article:

'CRIPPLED GIRL IN COURT.

'Emma Grenell, with Mutilated Arm and Hand, Hears Plea of Her Lawyer in Damage Suit. Witnesses Tell of Accident. They Recount How a Car of West Chicago Street Railroad Company Ran Her Down. Indictment of Lynch Recalled.

'The stump of an arm hanging uselessly in her jacket sleeve and with only three tiny fingers on her one hand, little Emma Grenell sat on her uncle's knee in Judge Smith's court to-day and smiled light-heartedly at the twelve men who are to decide whether the street railway company owning the car which mutilated the child shall make monetary recompense for her injuries. It was this tot's case over which a jury disagreed, and investigation of that disagreement brought about the indictment of ex-Bailiff Jas. J. Lynch on the charge of bribery. At that time attorney Alexander Sullivan acted as counsel of the West Chicago Street Railway Company, whose employe is charged with carelessly running down the child.

'END OF OPENING SPEECHES.

'To-day the lawyers finished their opening speeches and witnesses were called to tell how they had seen the accident which resulted in the injury of the child. It was on October 31, 1895. Emma, then only six years of age, was running across Western avenue, near Harvard street, when a West Chicago electric car came tearing along, struck the child, threw her under the wheels, crushed her hands, arms and one foot, and injured her side. The girl was taken to the Presbyterian Hospital, where she lay for six weeks, part of the time hovering between life and death.

'HER MOTHER IN COURT.

'Attorney Jas. McShane, for the plaintiff, pleaded for a

half hour with the jury before (pictures of Attorney Mc-Shane, Mrs. Grenell and her mother and Emma Grenell, interested parties in the Grenell damage trial) putting on his witnesses, the sad-eyed mother, Mrs. Grenell, and her aged mother, listening intently, and fondly watching the playful restlessness of the child. Mattie McKee related in measured tones how the girl had been brought to the Presbyterian Hospital, and how she had been watched over for weeks.

'Harvey Hull had been living at 438 Western avenue at the time, and he had seen the accident. His description of it was brought out by lengthy and detailed questioning.'

"That the said 'Daily News' is a daily newspaper published in the English language in the said city of Chicago; that it has a wide circulation, is very generally read, and that articles published therein necessarily attract the attention of persons interested or concerned in the subject-matter thereof; that in the said issue of the 'Daily News' above mentioned there also appeared the following statement of the circulation of said paper:

'FRIDAY, March 17, 1899.

'FEBRUARY CIRCULATION.

'STATE OF ILLINOIS, ⎫ ss.
'County of Cook. ⎬

'Victor F. Lawson, publisher of The Chicago Daily News, does solemnly swear that the actual number of copies of the paper named, printed and sold during the month of February, A. D. 1899, was as follows:' (Here follows a list of papers sold each day in February, and showing the average daily sales to be 266,761.)

'All "exchanges," copies used by employes, unsold or returned papers are omitted from the claimed circulation.

'VICTOR F. LAWSON.

'Sworn and subscribed to before me this 28th day of February, A. D. 1899.

'SAMUEL R. WELLS,
'Notary Public.

'The Advertisers' Guarantee Company of Chicago hereby certifies that it has by its expert examiners proven and attested the above figures as to circulation of the Chicago Daily News to be correct, and that the daily average paid circulation for the month of February was as above stated, 266,761 copies. This is guaranteed to the advertisers of the country by a bond of $50,000 in the Fidelity &

Deposit Co. of Maryland, deposited with the Northwestern National Bank of Chicago.

' Advertisers' Guarantee Co.

'By J. R. Mason, President.'

"That affiant has read the foregoing statement as to the circulation, and believes that the figures therein given are substantially correct, and that the affidavit of said Victor F. Lawson and the certificate of the Advertisers' Guarantee Company are true.

"That all of the said articles were conspicuously published in the papers referred to, the publication in the Daily News especially being placed in the second column of the front page; that both publications in the 'Record' are also accompanied with illustrations; that the said articles contain statements highly prejudicial to the interest of the defendant, including matters offered in evidence by the plaintiff and actually excluded by the court.

"That affiant believes from the wide circulation and influence of the said journals, from the conspicuousness of the publication, and from the nature of said articles, that they must necessarily, each and every one of them above, become known to many of the jurors in this case, and that being so known, the fact of the said publications, the statements therein contained, the strong tendency of the said articles and the illustrations, and the bias of the writers in favor of the plaintiff, must necessarily, being known to some of the jurors, become known to others, and must necessarily prejudice the interest of this defendant and prevent a fair and impartial trial of this case.

"George A. Yuille."

Here follows the jurat.

On reading the foregoing affidavit, appellant's attorneys moved the court for leave to withdraw a juror, and to continue the cause, and also moved the court to discharge the jury, which motions the court overruled.

March 21, 1899, when the court opened at 1:30 o'clock P. M., after the midday adjournment, appellant's attorneys presented to the court the following affidavit:

"E. Parmelee Prentice, being first duly sworn, on oath deposes and says that he is one of the attorneys for the defendant in the above entitled case; that upon the morning of March 21, 1899, a few minutes before the convening of the court, at about half past nine in the morning of said

day, affiant, while on the way to the court room where the
above entitled case was on trial, purchased at the door of
the court house a copy of the daily newspaper known as
'The Chicago Record,' for Tuesday, March 21, 1899; that
upon the third page of said issue of said 'Chicago Record'
appears the following article concerning the above entitled
cause:

'EMMA GRENELL SHOWS SCARS.

'Judge Smith Grants the Privilege Which Judge Hanecy
Denied.

' Despite fierce opposition from the lawyers of the West
Chicago Street Railroad Company, little Emma Grenell was
permitted yesterday in Judge Smith's court to show the
jury the mutilated limbs, on account of which she asks
damages.    The stump of the right arm, cut off close below
the shoulder, the left hand with only a thumb and finger
remaining, and the right foot, of which only a part remains,
were exhibited, and produced an evident effect on the jury.
Judge Smith's ruling, allowing the introduction of such tes-
timony, was in opposition to the course of Judge Hanecy,
who in the former trial refused to admit it.

'Mrs. Grenell, the mother of the child, testified to her
knowledge of the accident, and her account was corrobo-
rated by Edw. Robinson, of 38 Campbell Park, who told of
seeing little Emma walk diagonally across the street toward
her home, and of her being struck by the swiftly moving
car coming from the south.    He estimated the speed of the
car to be eighteen miles an hour, and was unshaken on
cross-examination as to this important point.    Frank Bow-
ers, a fellow employe of Robinson at Heywood Bros. &
Wakefield Rattan Works, told of being with Robinson and
witnessing the affair.    Edw. Hogland, a barber, and Fred
E. Gilbert, also gave evidence as to having been present.

'Dr. Stahman, of the Presbyterian hospital, described the
surgical operation necessary, and said it was remarkable that
the child recovered.

'At the close of the day the plaintiff's case rested, and
the evidence for the defense will be introduced this morn-
ing.    It is probable that the closing arguments will not be
made before Thursday.' "

It was further alleged in the affidavit that on the morn-
ing of March 21, 1899, just before the opening of the court,
and while the jury were in the jury box, the affiant, Pren-
tice, saw jurors Forsberg and Bernston reading said article

in the "Chicago Record," and also saw juror Hoffman with a copy of the March 21, 1899, issue of that newspaper in his hand.

March 22, 1899, while the trial was progressing, appellant's attorneys presented and read to the court an affidavit, which is as follows:

"E. Parmelee Prentice, being first duly sworn, on oath deposes and says that in the issue of the newspaper known as 'The Chicago Record' for March 22, A. D. 1899, there appeared upon the front page of said newspaper the following article, having reference to the above entitled cause:

'RAILROAD PAID THE WITNESSES.

' Testimony Brought Out Yesterday in the Grenell Case.

'Evidence for the defense was heard yesterday in Judge Smith's court in the suit of Emma Grenell against the West Chicago Street Railroad Company. A number of witnesses testified that they saw the car strike and run over the child. On cross-examination it was revealed that most of the witnesses had been paid by the company for loss of time due to the suit, and that several days had been thus compensated for in nearly every case.

'An attempt of the defense to break down the testimony of Conductor Olson met with a setback when Superintendent Fuller on cross-examination failed to state the date when he claimed to have discharged Olson. One of the principal witnesses was found on cross-examination to have boarded with Mrs. Grenell for a number of months and to have suddenly left without paying his bill.

'Witnesses testified that the car was going at the rate of two to four miles an hour at Harvard street and at eight to ten miles an hour after it left the crossing, in contradiction to the statement of witnesses for the prosecution, who claimed it was going at the rate of eighteen to twenty miles an hour.' "

Affidavit signed and sworn to by Prentice.

Thereupon appellant's attorneys made the same motions as on filing the first mentioned affidavit, which motions the court overruled.

March 22, 1899, when the court was about to adjourn for the day, the presiding judge addressed the jury as follows:

" Let me, before separating, warn the jury against allow-

ing anybody to speak to you about this case, or talk with anybody; and also avoid reading anything about the case which may be in the newspapers, as it is to be tried on the evidence here, and not upon any impressions that may be obtained from outside. You will report at half past nine to-morrow morning."

March 23, 1899, at the opening of court, appellant's attorneys presented and read to the court the following affidavit:

"E. Parmelee Prentice, being first duly sworn, on oath says that on Thursday morning, March the 23d, A. D. 1899, there appeared in the daily newspaper known as ' The Chicago Record ' the following article:

'GRENELL TRIAL ABOUT CLOSED.

' Evidence was closed in the Grenell case yesterday before Judge Smith, and Attorney McShane started to address the jury on behalf of the plaintiff. He was followed by Attorney Prentice for the West Chicago Street Railroad Company. Attorney Richolson will continue the defense this morning and the closing speech will be made by Russell M. Wing on behalf of the plaintiff. The principal testimony for the defense during the day was furnished by the motorman of the car that struck the child. His statements were to the effect that the car had slowed down at Harvard street to two or three miles an hour, and that when little Emma was struck the controller showed five points, or speed of about eight miles an hour.

' The declaration made by several of the other witnesses for the defense, that the child ran from behind a southbound car directly in front of the north-bound one, was also repeated by the witness. Several persons swore that these circumstances had attended the accident, but on cross-examination it was developed that they had been paid or expected to be paid by the company for testifying.'

" Affiant further says that upon the opening of court on the said day he saw a copy of the newspaper containing the said article in the possession of juror Janecke."

And thereupon appellant asked leave to withdraw a juror, but the court denied said motion, to which action of the court in denying said motion appellant, by its attorneys, then and there duly excepted.

March 23, 1899, at the time of adjournment for the day, the court addressed the jury as follows:

West Chicago St. R. R. Co. v. Grenell.

" I repeat again the admonition I gave you last night, that you shall refrain from talking with anybody about this case or allowing anybody to speak to you. Also you shall refrain from reading anything in the newspapers which may relate to this. If any of you should do that he would be in contempt for disobeying the advice and admonition of the court, and it is important that this case should be tried on the evidence heard, and not upon any information that might reach you from outside sources. We will adjourn until half past nine to-morrow morning."

March 24, 1899, at 9:30 o'clock A. M., appellant filed and called to the attention of the court the affidavit of E. Parmelee Prentice, as follows :

"E. Parmelee Prentice, being first duly sworn, on oath says that the following article appeared in The Chicago Record published on the morning of March the 24th, A. D. 1899 :

'EXPECT GIRL TO WIN.

'Verdict Soon in Grenell Suit. Auditors of Last Argument in Emma Grenell's Case Against the West Chicago Company Think She will Recover Heavy Damages.

'Emma Grenell's suit against the West Chicago Street Railroad Company closed last night with the address of Russell M. Wing to the jury. Judge Smith's court room had been crowded all the afternoon by spectators, drawn thither by the unusual importance of the case, the fact that bribery was alleged to have been committed in the former trial and the expectation that the principal counsel for the plaintiff would put forth all his (pictures of ex-Judge Russell M. Wing showing the characteristic attitudes of little Emma Grenell's attorney pleading for damages against a street car company) powers in his closing argument. For three hours ex-Judge Wing pleaded for the little girl, and it was the universal opinion of the spectators who had followed the trial, that a heavy verdict would be the result of the plea.

'ATTACKS CAR COMPANY'S METHODS.

'The fact that the witnesses for the plaintiff nearly all admitted having spent several days in the office of Alex. Sullivan and having been paid for their time, was made a basis of a general attack by ex-Judge Wing on the methods employed by the company. Glaring discrepancies in the testimony of the witnesses for the defense were brought to the jury's attention, and the attack of the company on Conductor Olson by trying to prove that he had been discharged

was shown to be due to the fact that Olson was given his choice between quitting the company's service and testifying according to its wishes. The falsehood of much of the testimony for much of the defense, he said was evident, and he dwelt upon the point with impressive earnestness.

'In closing, the lawyer made an eloquent plea for a verdict giving the little girl an amount sufficient to provide comfortably for her during her natural life.

'WILL INSTRUCT JURY TO-DAY.

'At the conclusion of the argument the plaintiff's counsel asked that the jury be immediately instructed, but Judge Smith postponed his instructions to this morning.'"

Appellant thereupon moved the court for leave to withdraw a juror and to continue the cause, and also moved the court to discharge the jury, which motions the court overruled.

In support of its motion for a new trial, appellant filed and read the following affidavit:

"Geo. W. Kroll, being first duly sworn, on oath says that he is and was during the whole of March, A. D. 1899, bailiff in the court room of Judge Abner Smith; that after the conclusion of the trial of this, the above entitled cause, this affiant went to the jury room, where the jury in this case had retired to consider their verdict, and that he there took from juror Wm. B. Janecke a copy of the Chicago Daily News, published on March 23, A. D. 1899; that he took from jurors Earl Anderson and another of said jurors, whose name this affiant does not remember, copies of the Chicago Record, dated and published March 24th, A. D. 1899."

Other rulings of the court were excepted to by appellant, which will be referred to in the opinion of the court. Venue and title are omitted from the affidavits referred to for convenience. It appears from the record that the affidavits were presented to the court out of the hearing of the jury.

JOHN A. ROSE and LOUIS BOISOT, JR., attorneys for appellant; W. W. GURLEY, of counsel.

There is no doubt that the reading of newspapers by jurors, while engaged in the trial of a cause, is an inatten-

tion to duty which ought to be promptly corrected; and if the newspaper contains any matter in connection with the subject-matter of the trial which would be at all likely to influence jurors in the performance of duty, the act would constitute ground for a motion for a new trial. People v. McCoy, 71 Calif. 395, 397.

See also Meyer v. Cadwalader, 49 Fed. Rep. 32; Telegram Newspaper Co. v. Commonwealth, 52 N. E. Rep. 445.

The Supreme Court of California says:

" It is exceedingly unfortunate that a newspaper should publish such an article pending the trial of an important criminal case. Newspaper comments of this character are well calculated to interfere with the due and proper administration of justice. The jurors should not have read the article. * * * The publication of such articles during the pendency of important trials serves no good purpose, but, on the contrary, tends to impede and adulterate the stream of justice. This article results in giving a defendant a new trial in an important case, for we discern no other ground for a reversal of the cause, save the one now under consideration." People v. Stokes, 103 Calif. 193, 197. See also, Cartwright v. State, 71 Miss. 82–85; Hasson v. Railroad Co., 21 W. N. C. (Pa.) 96.

Permitting jurors to have, during the progress of the trial, access to newspapers containing imperfect or incorrect accounts of the trial, together with comments upon the person and character of those connected with the trial, is of itself sufficient to vitiate the verdict rendered by them. Walker v. State, 37 Tex. 366; Carter v. State, 9 Lea (Tenn.) 440; Farrar v. State, 2 Ohio St. 54.

Attempt to influence the verdict of a jury by other means than by evidence and argument in open court, is always ground for a new trial on grounds of public policy, without reference to the merits of the case, even when the attempt is from some officious third person. West Chicago St. R. R. Co. v. Luka, 72 Ill. App. 60.

" It is unfortunate for the jury system, and for the cause of justice, that such episodes should occur in the trial of causes, but the evil will be soonest suppressed by wiping out verdicts rendered under such circumstances." People v. Mitchell, 100 Calif. 328.

Thus it has been repeatedly held that a verdict will be set aside where the jury during their retirement had in their possession a copy of the statutes or other law book. Merrill v. Nary, 10 Allen (Mass.), 416; State v. Smith, 6 R. I. 33; Harris v. State, 24 Neb. 803; Jones v. State, 89 Ind. 82; Newkirk v. State, 27 Ind. 1; Nolan v. Vosburg, 3 Ill. App. 596; Pittsburg, C., C. & St. L. R. Co. v. Dahlin, 67 Ill. App. 99. See also Elliott v. Luengene, 39 N. Y. Supp. 850-854; O'Brien v. Merchants' Fire Ins. Co., 6 Jones & S. 482-488; State v. Walton, 92 Iowa, 455.

WING & CHADBOURNE and JAMES C. McSHANE, attorneys for appellee.

The fact that the jurors have read newspapers during the trial of a case is not of itself a ground for disturbing the verdict, or granting a new trial, if the newspapers do not contain prejudicial comments on the case. 12 Enc. of Pl. & Pr. 622; Fogarty v. State, 80 Ga. 450; State v. Wilson, 121 Mo. 434; State v. Brown, 7 Ore. 200.

But even where the jurors received newspapers containing accounts or comments upon the case, a new trial will not be granted if there was nothing calculated to mislead or improperly affect their minds, or to prejudice their verdict. People v. Leary, 105 Cal. 486; State v. Cucuel, 31 N. J. L. 249; U. S. v. Reid, 12 How. (U. S.) 361; McKee's case, 3 Cen. L. J. 258; Sherwood v. Chicago, etc., R. R., 88 Mich. 108.

MR. JUSTICE ADAMS delivered the opinion of the court.

Appellant's counsel contend that the verdict is manifestly contrary to the preponderance of the evidence. As the case must be remanded for another trial, we do not deem it necessary or expedient to comment on the evidence further than to say that the evidence bearing on the question whether or not the accident was occasioned by appellant's negligence, is so conflicting and contradictory that, had the verdict been for the appellant, we would not be warranted in setting it aside on the ground of its being against the weight of evidence.

We regard the question whether the court erred in refusing to discharge the jury, or to grant a new trial, on account of the facts alleged in the affidavits set out in the preceding statement, the most serious presented by the record. It seems hardly necessary to say that the newspaper articles set forth in the affidavits, if seen by any juror, were eminently calculated to prejudice him against the appellant. If to prejudice the minds of the jurors against the appellant had been the intention, the articles could not have been more ingeniously devised to effect that purpose. The article of March 17th, published the next morning after the impaneling of the jury, states that the jury on the former trial had been bribed; that two of the jurors had so confessed to the State's attorney; that one of them was to receive $100 and another $75, and that they were both under bonds to appear at court. The article contains the name and residence of each juror, purports to describe the injuries of appellee, and states that the case is to be given another chance for "justice." The publication in the Chicago Daily News of March 17, 1899, describes appellee's injuries and refers to the jury as "the twelve men who are to decide whether the street railway company owning the car which mutilated the child shall make monetary recompense for her injuries." The article also refers to bribery of jurors on the former trial.

The article published in the Chicago Record, March 22, 1899, commenting on the evidence of the witnesses for appellant, states: "On cross-examination it was revealed that most of the witnesses had been paid by the company for loss of time due to the suit, and that several days had been thus compensated for in nearly every case;" also, that an attempt of appellant to break down the testimony of Olson, a witness for appellee, had met with a set-back; and that it appeared that one of appellant's principal witnesses had boarded with Mrs. Grenell, appellee's mother, a number of months, and left suddenly without paying his bill.

In the article of March 23, 1899, in the Chicago Record, this appears:

" The declaration made by several of the other witnesses for the defense, that the child ran from behind a south-bound car directly in front of the north-bound one, was also repeated by the witness. Several persons swore that these circumstances had attended the accident, but on cross-examination it was developed that they had been paid or expected to be paid by the company for testifying."

Mr. Prentice, in his affidavit, deposed that he saw a copy of the newspaper containing the article in the possession of Janecke, one of the jurors.

The article published in the Chicago Record on the morning of March 24, 1899, after the argument of counsel had closed, and before the jury had been instructed, states that " it was the universal opinion of the spectators who had followed the trial, that a heavy verdict would be the result of the plea." referring to Judge Wing's argument, and contains the following :

" The fact that the witnesses for the plaintiff nearly all admitted having spent several days in the office of Alex. Sullivan, and having been paid for their time, was made a basis of a general attack by ex-Judge Wing on the methods employed by the company. Glaring discrepancies in the testimony of the witnesses for the defense were brought to the jury's attention, and the attack of the company on Conductor Olson by trying to prove that he had been discharged, was shown to be due to the fact that Olson was given his choice between quitting the company's service and testifying according to his wishes. The falsehood of much of the testimony for the defense he said was evident, and he dwelt upon the point with impressive earnestness."

It appears by the affidavit of George W. Kroll, copied in the preceding statement, that he was the bailiff who attended the jury when they retired to the jury room to consider of their verdict, and that he took from juror William B. Janecke a copy of the Chicago Daily News of March 23, 1899, and from juror Earl Anderson and another juror copies of the Chicago Record of March 24, 1899.

The articles, in effect, warned the jury that the eye of the public was on them; that it was expected that in justice to appellee they would give a heavy verdict; that their names and residences were known, and that if they should

find for the appellant, they would subject themselves to the suspicion of bribery. The articles also plainly intimated that witnesses for appellant were bribed, or were, for other reasons, not worthy of credit. In short, the probable effect of the articles on the mind of the ordinary juror would be to prejudice him against the appellant and its witnesses, and to intimidate him, and swerve him from an impartial consideration of the case.

The only direct evidence that newspapers containing the articles in question came to the hands of the jurors, is that of Prentice, who deposed that he saw two of the jurors reading the article in the Chicago Record of May 21, 1899, and the newspaper containing that article in the hands of another, and also saw in the possession of juror Janecke a copy of the paper containing the article of March 23, 1899, and the affidavit of bailiff Kroll as to taking from jurors copies of the Chicago Daily News of March 23, 1899, and of the Chicago Record of March 24, 1899.

It has been held in cases like the present, that direct evidence that newspaper articles prejudicial to one of the parties were read by the jurors, or some of them, is not necessary to warrant the granting of a new trial; that it may be inferred from circumstances that the jury read the articles.

In Meyer v. Cadwalader, 49 Fed. Rep. 32, a new trial was granted solely on the ground of publications made during the trial of a character to prejudice the jury. The court, in its opinion, says:

"It is idle to say that there is no direct evidence to show that the jury read these articles. They appeared in the daily issues of leading journals and were scattered broadcast over the community. The jury separated at the close of each session of the court, and it is incredible that, going out in the community, they did not read these newspaper publications."

But in the present case it is not necessary to resort to the presumption indulged in by the court in the case cited. The articles of March 21st, 23d and 24th have been traced to the hands of jurors, and there is positive evidence that

two of the jurors read the article of March 21st, and that another had it in his hands.   We think it a legitimate inference that the articles of March 23d and March 24th, which were as prejudicial to appellant as any published, were read by the jurors in whose possession they were found.

That the reading by jurors of newspaper articles prejudicial to one of the parties is cause for a new trial, we regard as well settled.   People v. McCoy, 71 Cal. 395; People v. Stokes, 103 Ib. 193; Cartwright v. The State, 71 Miss. 82; Walker et al. v. The State, 37 Tex. 366; Carter v. State, 77 Tenn. (9 Lea) 440; Farrer v. The State, 2 O. St. 54.

In the present case two of the jurors were named in Prentice's affidavit as persons whom he saw reading the article of March 21, 1899, and two from whom the bailiff took the articles of March 23d and March 24th are named in the bailiff's affidavit.   Prior to the publications of March 23d and 24th, the jury were instructed by the court to refrain from reading anything in the newspapers about the case.   No affidavits of jurors were produced denying the reading of the articles in question, although it is familiar law that the affidavits of jurors to sustain their verdict are admissible.   We are of opinion that on the affidavits in respect to the articles in question, the court should have granted a new trial.

Appellant's counsel object to the refusal of the court to strike out the testimony of alleged incompetent witnesses as to the speed of the appellant's car at the time of the accident, the retention on the panel of a juror named Condon, whose discharge was moved by appellant on the ground, supported by affidavits, that in his examination he made false statements, thereby inducing his acceptance by appellant as a juror, when otherwise he would have been peremptorily challenged, and the refusal of certain of appellant's instructions.   The question as to the competency of witnesses as to speed, value, etc., rests largely in the discretion of the court, and the witnesses having testified, we find no material error in the refusal of the court to exclude their evidence after their cross-examination.   It was for the

jury, who heard their evidence, to decide as to its weight and credibility. The question as to the retention of juror Condon on the panel is not likely to arise on another trial, and we do not deem it necessary now to pass on that question.

The court gave twenty-seven instructions for appellant, fairly and fully instructing the jury as to the law of the case, and we find no material error in the refusal of instructions. No instructions were given on behalf of appellee.

Counsel further object to the exhibition to the jury of appellee's injured limbs. In this there was no error.

For the reason heretofore stated, the judgment will be reversed and the cause remanded.