PHILLIPS ET AL. *v.* BOARD OF EDUCATION OF PICKAWAY
TOWNSHIP RURAL SCHOOL DIST. ET AL.

*Wills—Contest—Testamentary capacity established by evidence—Undue influence not proven—Misconduct of jurors —Reading of newspaper reports of former trial—Failure to request withdrawal of juror and continuance—Verdict cannot be impeached by affidavits of jurors.*

1. Evidence *held* to show that testator at time of making will was able to understand nature of business, nature and extent of property, names of claimants on his bounty, his relationships, and had ability to choose as to dispositions of property.
2. Evidence *held* to show that testator was not unduly influenced in making will.
3. In will contest, where attorneys for contestants first furnished newspaper data as to facts of former trial and contestees replied thereto in subsequent newspaper publication, contestants cannot complain that reading of such articles influenced jury and fair trial was not had, where no request was made to withdraw a juror and continue cause.
4. Reading of newspaper articles by jurors, prejudicial to one litigant, is cause for new trial, but to make such ground available there must be evidence that articles came to jury's attention and court was requested to withdraw a juror and continue the cause.
5. Affidavits of jurors will not be received to impeach their verdict, especially in view of amendment of the Constitution in 1912 providing that three-fourths of jury may return verdict.

(Decided February 4, 1924.)

ERROR:   Court of Appeals for Pickaway county.

*Mr. Barton Walters, Mr. Irvin F. Snyder,* and *Mr. Charles Gerhardt,* for plaintiffs in error.

*Mr. I. N. Abernethy, Mr. Chas. J. Pretzman, Mr. Charles H. May* and *Mr. C. A. Leist,* for defendants in error.

CUSHING, J.   The action in the court of common pleas of Pickaway county, Ohio, was prosecuted to set aside the will of Nelson Hitler, deceased.   The issue was made under the statute as to whether or not the paper writing produced was the last will and testament of Nelson Hitler.

The will was executed July 19, 1915.   Nelson Hitler died January 31, 1917, a short time after his eighty-fourth birthday.   He had resided on a farm in Pickaway county all his life.   He owned between 2,200 and 2,300 acres of land in that county, also live stock, farm products, personal property, and money, all of the value of at least $400,000. The terms and conditions of the will will not be stated other than to recite that he bequeathed to his relatives money aggregating $156,000.

Pursuant to a contract entered into in 1908, he had deeded to George Steely and Jessie Steely, his wife, a farm of 160 acres.   In 1916 he gave Jessie Steely $25,000, evidenced by a certificate of deposit on a bank in Circleville, Ohio.   The contract provided that the Steelys were to live with him and take care of him and his property.   From the record, the character of the services, and the faithfulness with which the Steelys cared for him and his business, it should be observed that they performed their part of the contract in a way that few persons, relatives or strangers, would care for the aged.

Nelson Hitler was a rather unusual man.   The

record does not disclose much, if anything, of his early life. At the age of 46 he inherited 470 acres of land, and subsequently, in 1889 and 1895, inherited land and property from his brothers. In his lifetime he had accumulated land and personal property, making his estate about $400,000. He did not marry, or have any love affair. He lived by, and to, himself. He did not attend any school other than the district school. He did not purchase or deal in any stocks or bonds, or engage in any business other than farming. His interest was centered in his work and the community in which he lived. He was the first person to sign the petition for centralizing the school district of Pickaway township, and gave $5,000 to establish a library at that school. He gave $12,000 to build a chapel at the Hitler Cemetery, on the condition that it would be available to all denominations for the purpose of holding services, and set aside $3,000, the income from which was to be used to maintain the cemetery.

He stated that in his opinion the farms in Pickaway county were too large, and observed that few men were able to successfully handle large tracts of land, implying that it was better for the community that the farms be small, so that each owner could look after his own farm.

Nelson Hitler was a robust, vigorous man, fond of the out-of-doors and of animal and plant life. He had numerous tenants to whom he rented farms on shares. Some of them remained with him for many years. He never had a written contract with any of them. They settled sometimes once a year, or once in two years. There is no evidence of

friction or disagreement between him and any of his tenants. In all of his dealings with his neighbors and merchants, we do not find in the record evidence of any serious disagreement, nor an attempt at sharp practice on his part. He was careful of what he said and wrote. For years he had not written a letter, but employed a lawyer at an annual stipend to write his letters. The basis of his good will toward his relatives seems to have been their habits of industry and thrift. When he came to make his will, he gave substantial sums to all of his relatives except a sister. She was then 72 years of age, and had a life estate in 900 acres of valuable land in Pickaway county. Nor did he make Arthur Phillips, who was the prospective owner of a valuable farm, any bequest.

Toward the end of his life of more than four score years, when he made his will, he gave the residue and remainder of his estate, estimated at more than $200,000, to the centralized school district of Pickaway township. It is this clause of the will, and the fact that he made a will at all, that the contestants attack, as being procured by undue influence, and on these they base their claim that he did not have testamentary capacity.

There is no evidence of what Hitler did in the winter of 1914-15. We will assume that he was at home surrounded by those who were working and caring for him. In the late winter or early spring of 1915, out of silence as it were, without arrangement or notice, he presented himself unaccompanied at the lawyer's office, and announced for the first time in his life that he wanted to make a will. He had prepared, and had with

him, memoranda, in his own handwriting, from which he gave the data for the preparation of the will. He returned home and came to the office the next day to execute it. On both of these occasions the testator and the attorney were the only ones present. On the second day, the attorney suggested that he would like to be named one of the executors. Hitler became displeased at this suggestion, left the office, and did not return for some four months. In July following, the attorney called him on the telephone and suggested that if he desired to complete the will he should come to his office. Either in that conversation, or when he returned to the office, the attorney assured him that he did not care to be an executor. The will was then finished and executed. Hitler, unaccompanied, took the will to the First National Bank, and handed it to Mr. Benford, president of the bank, and told him that the envelope contained his will, and he wanted him to take care of it. It remained in the bank, under Benford's control, until after Hitler's death.

The action to contest the will has been tried twice. The will was sustained at each trial. Contestants now seek to set aside the second verdict. They claim that it was not supported by the evidence and that they did not have a fair trial. They charge misconduct of a number of the jurors, and that the jury were influenced by articles published in newspapers in Circleville, while the trial was in progress.

Contestants devote much space in their briefs to the questions of testamentary capacity and undue influence. They claim that Hitler was old,

and so feeble in mind and body, in 1915, that he did not have mental capacity to be within the rules of law provided in such cases; that for 27 years he had suffered from vertigo; that he was sick in 1913, 1914, and 1915, and after that failed rapidly; that when going about the farm, or from one farm to another, he would stagger and fall, and had to be assisted; that he could not remember the land he owned, or the number of acres in the different farms, although prior to that time he knew every farm and the acreage of each field; that he tried to purchase articles that he did not need, and on one occasion drove 14 miles to Chillicothe to buy barley. On arriving in that city he said, "Well, here we are, and no barley." They claim that on another occasion he insisted on purchasing a roll of wire fence and taking it home; that it was too large to get in the vehicle, so to satisfy him they took a smaller roll. At another time he insisted on purchasing 3,500 feet of rope, when all he needed was 150 feet. Witnesses for contestants testified to a number of incidents of similar and of different character, for the purpose of establishing that he did not possess testamentary capacity in 1915.

Many of the numerous witnesses for contestees testified that most of the acts testified to by witnesses for contestants happened in the latter part of 1916, and not in 1915. Six of the witnesses for contestants base their opinion of his testamentary capacity in 1915 on one observation each. Other witnesses for the contestants saw him twice, or a few times. None of the witnesses for contestants saw much of him, except one tenant, and that

witness' testimony is denied by all the other tenants. The witnesses for contestees, those who lived with him, his tenants, with the one exception named, those that saw him frequently, and transacted business with him in 1914 and 1915, all testified that his physical and mental condition in 1915 was good, and that he had testamentary capacity, also that he attended to his vast business during the years in question.

Our inquiry into Hitler's mental condition is limited to the months of February, March, and July of 1915, unless the senile dementia from which he suffered in the late months of 1916, and from which he died, was a disease of slow growth and related back to the months in question. In this connection, we will consider the effect his illness of March, 1916, had on that disease.

After his recovery from the attack of bronchial pneumonia in March, 1916, he did not fully regain his physical strength, and as the months passed it was evident that he was growing weaker in body and mind. It is evident that the infirmities of old age were aggravated by that illness. Some months after his recovery from bronchial pneumonia, he lost control of his organs, and at times of his faculties. That sickness seemed to have the same effect on him as an accident, a death, or a shock is said to have on senile dementia; that is, it aggravated the disease.

From his activity, the attention he gave to his business, and from what we gather of his daily life, we conclude that he was not afflicted to any appreciable degree by senile dementia, either at

the time of giving the data for his will, or at the time of its execution.

It is claimed that he did not have testamentary capacity to come within the rules of law required to enable him to make a will. When he gave the data from which the will was prepared, at its execution, and at the time of its delivery to Mr. Benford, he knew the nature and extent of his property. This conclusion is reached after considering his statement when asked whether he had money and property with which to pay in cash bequests totaling almost $175,000, to which he replied that he was worth $300,000. It developed that the value of his estate was more than $400,000. His statement on that occasion was an expression of confidence that he had enough to pay all cash bequests and more. He stated the relationship of all those to whom he gave money. He had a clear idea of the habits and characters of his relatives to whom he made bequests. He named the persons who were to receive money, those for whom trusts should be created, and directed that the court should name the trustees.

It is argued that he did not appreciate his relation to his family, because he did not mention or provide for a sister. After naming his nieces and nephews, grandnieces and grandnephews, it does not reflect on his mental condition that he did not give his sister anything, as she was then 72 years of age, and had the income from a farm of 900 acres.

The rule defining ''testamentary capacity'' is stated to be that the testator must understand the nature of the business in which he is engaged,

the nature and extent of his property, the names and identity of those who have claims upon his bounty, his relationship to the members of his family, and must be able to choose with reason and understanding between one disposition and another. *Niemes* v. *Niemes,* 97 Ohio St., 145, 119 N. E., 503; *Wilson* v. *Mitchell,* 101 Pa., 495. From the evidence in this case we find that Nelson Hitler had testamentary capacity in 1915, and that the evidence brings him well within the rule stated.

This conclusion is emphasized by the facts that when he employed a lawyer to write his letters for him he would only pay $10 a year for that service; that when he made his will, he refused to name a lawyer as one of his executors; that when presented with the bill of $25 for drawing the will he stated that he was satisfied, as he understood some lawyers charged several hundred dollars for drawing a will. After his sickness in March, 1916, when he wanted to give Jessie Steely something to show his appreciation of the care and attention that she had given to him, he stated to her that he wanted to give her something, and asked her what she wanted. She said that he should give her anything that he pleased, but she would not state what she wanted. When she declined to so state, he did not give her anything. He brought the subject up later, and again asked her what she wanted. On her declination, he put his hand in his pocket and said that if he had 50 cents he would give it to her, as she would not state what she wanted. For a third time, he brought up the subject, and told her to get a paper out of the drawer. It was a certificate of

deposit for $25,000. After indorsing it, he told her that it was hers, that he wanted her to keep it for herself, that lawyers would try to take it away from her, but that she should hold on to it.

Contestants argue that Hitler was unduly influenced to make a will and to make the disposition of his property that he did; that an inference can be drawn that some person influenced him to make a will; otherwise, he would have died intestate and his property would have descended to his heirs.

In the case of *Monroe v. Barcley,* 17 Ohio St., 302, 93 Am. Dec., 620, it was held that undue influence must amount to fraud, and be of such character as to restrain the testator in the disposition of his property, so that the mind of another, and not testator's independent wishes and judgment, is expressed in the will. Some cases have held that in order to vitiate a will, the undue influence must have forced a disposition of the property different from what the testator intended, and the influence must have been exerted for that purpose.

The only charge of undue influence was directed against M. A. Sweetman and George Steely. We gather from the arguments of counsel that that influence was exerted rather to have him make a will than to direct the disposition that should be made of his property; that Sweetman wanted to be the attorney for the executors, and that Steely wanted an opportunity to earn the fees as an executor of the will. There is no evidence that either of these men at any time suggested to Hitler that he make a will. Other than Sweetman's telephone

call to inquire whether or not he wanted to complete his will, there is nothing in the record to show at any time any cause other than Hitler's own desire for going to Sweetman's office early in 1915 for the purpose of making a will. Neither Sweetman nor Steely was a beneficiary under the will. Neither the naming of Steely as one of the executors nor his acceptance of that trust can be construed as bearing any relation to an attempt by him to procure Hitler to make a will. Nor can an inference be drawn from Sweetman's desire to be named one of the executors, and his telephone conversation in July, that there was an attempt on his part to influence Hitler to either make a will or dispose of his property as he did.

There is nothing in the record to show that any member of the board of trustees of the centralized school district of Pickaway township had any knowledge that Hitler was going to make a will, or that he was going to leave anything to that school district. One witness testified that some years prior to the making of the will he was talking with Hitler about the change in farm implements, and stated to him that in former years farmers and farm hands could work in wood; that most of the farm implements at that time were of wood, while in late years they were mostly constructed of iron and steel; and that there should be a blacksmith shop at the school for the purpose of giving the youth some familiarity and skill to work with iron and steel, whereupon Hitler said, "I will attend to that later."

Our conclusion is that there was no influence, undue or otherwise, exercised on Hitler to make a

will, or to make the disposition of his property that he did, and we find that the verdict of the jury and the judgment of the court below are supported by the great weight of the evidence.

On the question of an unfair trial, due to newspaper publications and misconduct of jurors, the affidavits filed in support of and against the motion for a new trial disclose that on April 30, 1923, the first day of the trial, attorneys for contestants furnished data, and either requested or procured to be published in one of the newspapers in Circleville an article containing statements of alleged facts as to what happened at the first trial of the case. It contained what purported to be a record of how the jurors voted at different times while the verdict was being considered; a statement that a number of jurors thought that the verdict should have been set aside and a new trial granted; and a statement that the contestants did not have a fair trial.

On May 3 some of counsel for the contestees partially prepared, and a newspaper published, an article commenting on the first trial of the case, and gave as the reason the reviewing court assigned for setting the verdict aside the fact that the trial court had withdrawn from the jury's consideration the question of undue influence. Two other articles were published, one May 25, and the other May 28. Counsel for contestants argue that the publications of May 3, 25, and 28 polluted the stream of justice. They do not explain their act of procuring the publication of April 30.

One thing is settled, that counsel for contestants were the first offenders against the administration

of justice. Their act presents the question as to whether or not they wanted a fair trial, or were seeking to influence the jury from sources outside of the courtroom, and whether or not they were laying the foundation for error in case the verdict was against them. If they intended to lead counsel for contestees into replying in kind to their newspaper article, counsel for contestees fell into the trap laid for them. In view of this situation, caution must be exercised to the end that the rights of litigants will not be jeopardized by the ill-advised acts of counsel.

Counsel for contestants argue that the publishers could not be held for contempt, as they were not before the court, or so near thereto as to obstruct the due administration of justice. The impression gathered from the affidavits is that whatever was done counsel and not the publishers were responsible for it. They were before the court, and had the facts as they now appear been presented to the court it would have been justified in imposing the severe penalty provided by the General Code of Ohio. As soon as the court was advised of the publications in May, it cautioned the jury, and emphasized its instructions with reference to the manner in which the jurors should conduct themselves and on and by what they should consider and determine the case.

Numerous cases are cited holding that newspaper publications, anonymous letters sent to the jury room, or received by jurors, and the presence in the jury room of a newspaper containing part of the court's charge, are grounds for setting aside the verdict.

The rule is that the reading of newspaper articles by the jurors, prejudicial to one of the parties litigant, is a cause for a new trial; that in order to make such publications available as a ground for a new trial there must be evidence that such articles came to the attention of those members of the jury that returned the verdict, and that the court was requested to withdraw a juror and continue the cause. The rule stated is a summary of the decisions in the following cases: *Ohio & W. Dock Co.* v. *Trapnell,* 88 Ohio St., 516, 103 N. E., 761; *West Chicago St. Rd. Co.* v. *Grenell,* 90 Ill. App., 30, 31; *Meyer* v. *Cadwalader* (C. C.), 49 F., 32.

One of the jurors that signed the verdict read the article of May 3. He did not read any of the other articles. The other eight jurors that signed the verdict did not read, nor was their attention called to, any of said newspaper articles. Counsel for contestants knew of the publication of all of these articles. They did not at any time during the trial move that a juror be withdrawn and the cause continued.

It is also contended that the verdict should be set aside on account of misconduct of certain jurors, both in and out of court. The juror John C. Haynes did not sign or agree to the verdict. He charges a number of members of the jury with misconduct during the trial, in that they expressed opinions of the case, and of the testimony of witnesses, and displayed antipathy for one of the parties to the case. At no time did Haynes advise the court of what was going on. He waited until after the verdict had been returned, and is now

assisting counsel in their effort to set the verdict aside.

It is a settled law of Ohio that the affidavits of jurors will not be received to impeach their verdict. *Farrer* v. *State,* 2 Ohio St., 54; *Holman* v. *Riddle,* 8 Ohio St., 384; *Hulet* v. *Barnett,* 10 Ohio, 459; *Kent* v. *State,* 42 Ohio St., 426; *Goins* v. *State,* 46 Ohio St., 457, 21 N. E., 476; *Corrigan* v. *Rockefeller,* 67 Ohio St., 354, 371, 66 N. E., 95. These cases were decided prior to the amending of the Constitution in 1912, and the enactment of the law that three-fourths of the jury could return a verdict. The question presented is somewhat different from the facts in the decided cases. The case here presents the question of the minority of the jurors seeking by indirect methods to nullify the act of the majority. All that should be said on this question is that such acts are contrary to the spirit of our institutions and deserve just condemnation.

The acts of misconduct of the jurors named by Haynes and other persons are set out in the affidavits filed. It would serve no good purpose to analyze and compare the facts stated in these different affidavits. Suffice it to say that we have read, compared, and analyzed each statement in those affidavits, and find from the evidence that the charges of misconduct of jurors are not sustained by the evidence.

Counsel for contestees cite the statute, and argue that substantial justice has been done, and, therefore, that the verdict should be affirmed. We are not willing to rest our decision on that statute. Important rights of litigants are at stake, and they

are entitled to the best consideration and judgment of which this court is capable.

Nelson Hitler either made this will of his own accord, or some person or persons unduly influenced him to make it. When we turn to the long path of life that he traveled, there is nothing to show that he was ever influenced by any person or thing other than his own judgment and will. Independent action was his chief characteristic. We are asked to find from the evidence that M. A. Sweetman, or George and Jessie Steely, or the three together, influenced him to make the will, and also to make the provisions that he did. There is no evidence, either direct or circumstantial, from which such an inference could be drawn. So far as the record is concerned, neither the Steelys nor Sweetman knew that he was contemplating making a will. Sweetman did not learn of it until he came to his office for that purpose. The Steelys did not know he had made a will until a few days before his death.

The next inquiry is: Was he of sound and disposing mind and memory in February, March, and July, 1915?

We have shown from the evidence that he met the requirements of the law in that particular. In fact, from a consideration of the evidence we can go further. Not only was his mental condition sound during the year 1915, but in 1916, after his severe illness in March of that year, when he was not physically fatigued, he was of sound mind.

Our conclusion is that on a consideration of all the evidence the verdict of the jury is amply supported by the weight of the evidence; that a fair

trial was had; and that the verdict and judgment of the trial court should be affirmed.

*Judgment affirmed.*

BUCHWALTER and HAMILTON, JJ., concur.

Judges of the First Appellate District, sitting in place of Judges MIDDLETON, MAUCK and SAYRE of the Fourth Appellate District.