DETERMINED IN THE

## FIRST DISTRICT

OF THE

# APPELLATE COURTS OF ILLINOIS

DURING THE YEAR 1912.

## Thomas Trohey, Appellee, v. Chicago City Railway Company, Appellant.

### Gen. No. 16,428.

NEW TRIAL—*when scurrilous newspaper articles charging impeding administration of justice require.* If at the time a jury retires to consider of their verdict, two of their number had with them newspapers containing articles charging one of the parties with seeking to impede the fair administration of justice, a verdict against such party should be set aside, even though the articles in question were in no wise inspired by the other party to the cause and even though there be no direct evidence that any of the jurors read such articles—no showing having been made that the jurors did not in fact read such articles.

Action in case for personal injuries. Appeal from the Superior Court of Cook county; the Hon. FARLIN Q. BALL, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1910. Reversed and remanded. Opinion filed March 12, 1912.

JOHN E. KEHOE and C. LE ROY BROWN, for appellant.

GEORGE E. GORMAN and McGOORTY & POLLOCK, for appellee.

(1)

MR. PRESIDING JUSTICE BALDWIN delivered the opinion of the court.

This is an appeal from a judgment for $12,000 entered against appellant after the court had required appellee to remit $3,000 from a verdict of $15,000. The action was for personal injuries sustained November 27, 1902. Plaintiff claimed he was thrown from his wagon by reason of its being struck by a street car of defendant. Defendant denied that any car struck plaintiff's wagon and claimed that no street car had anything whatever to do with the accident. The case has been tried three times. The first trial resulted in a verdict for $8,000. A new trial was granted and the case was tried a second time, resulting in a disagreement of the jury.

The declaration contained one count and alleged that defendant negligently ran and operated a south-bound car upon Clark street and that said car collided with a wagon being driven on said street by plaintiff. The *ad damnum* was $15,000.

The accident took place November 27, 1902. Trohey was a teamster. At that time he was driving a two horse wagon hauling crushed stone from the plant of his employer at Nineteenth and Lincoln streets to the corner of Twenty-second street and Archer avenue. His course in making deliveries was from Lincoln to Eighteenth, east on Eighteenth to Clark and south on Clark to Twenty-second. Trohey's wagon itself weighed 3,100 pounds and it was loaded with four tons of crushed stone. When he reached, and turned south in, Clark street, he fell from his wagon and two wheels of it passed over him. Clark street at and about its intersection with Eighteenth street was well paved both inside and outside the street railway tracks. The paved space between the west rail of the west track in Clark street and the west curb was 17 to 20 feet wide and there was nothing to prevent any one driving in that portion of the roadway.

Trohey claimed that when he turned south from

Eighteenth street in Clark street, he made the turn in the west or south-bound track and then proceeded southward in that track; that when he reached Clark street, he saw approaching him, and about a half a block north, a south-bound car, and that, after seeing it, he continued to drive south in the track until he reached a point about fifteen feet south of the south walk on Eighteenth street, where he began to turn out; he testified that he did not look back from the time he first saw the car approaching and did not know whether the wheels of his wagon were in the street or were in the track at the time he felt a jolt or jar and fell from his wagon; nor did he know whether or not the car struck his wagon. Other witnesses, on his behalf, however, testified that a south-bound car did strike his wagon. A larger number of witnesses, on behalf of defendant, testified that plaintiff turned south in Clark street and started to drive in the open, newly-paved space between the west track and the west curb, and that at, a point near the south line of Eighteenth street, he fell forward between his horses without the street car touching or having anything whatever to do with his wagon.

The principal controversy at the trial was over the question whether or not any of defendant's cars came in contact at all with Trohey's wagon. Defendant denied that there was any such contact, and insists that the testimony for plaintiff does not affirmatively show either negligence on the part of the railway company, nor that plaintiff himself was in the exercise of ordinary care for his own safety.

At the time of the trial, there was some public excitement because of charges made by the state's attorney that the jury commissioner's office was corrupt, and that jury tampering on an extensive scale was being practiced. During the trial of the cause and on the morning it was submitted to the jury, the "Chicago Examiner" published an article seriously reflecting

upon appellant, and it appeared that at the time the jury retired, two of the jurors took with them to the jury room copies of the paper containing the article. After being out several hours, the jury returned a verdict for $15,000.

Appellant seeks a reversal here, and contends: That the manifest preponderance of the evidence is to the effect that plaintiff fell from his wagon without any contact with any car of or negligence on the part of the defendant; that the court committed reversible error in rulings upon the admission and rejection of evidence; that the jury was prejudiced against appellant by the scurrilous "Examiner" article, and by other incidents of the trial; and that the damages are grossly excessive.

After an extended and careful examination and consideration of the case made in the court below, and of the briefs and arguments submitted, we have reached the conclusion that the judgment must be reversed and the cause remanded for another trial. This conclusion is based upon the ground that the court below should have granted a new trial because certain of the jurors took with them to the jury room copies of a newspaper containing an article, seriously reflecting upon appellant.

The case had been tried twice before. It involved a sharp conflict in the testimony for the respective parties; and it was of vital importance to the orderly administration of justice between the parties that no improper influence should be brought to bear upon the jury.

In support of its motion for a new trial in the court below, appellant filed the affidavits of John E. Kehoe, Esq., its attorney who tried the case, and Michael Ryan, an investigator and clerk connected with its law department, respectively. From these affidavits it appeared that, when the jury retired to consider its verdict, at least two of the jurors carried with

them copies of that morning's "Chicago Examiner," a Chicago morning newspaper, in which there appeared upon its first page, with large conspicuous headlines, an article as follows:

"Chicago Examiner

Wednesday, October 6, 1909.

Trails Jury Fixers to Traction School—Wayman locates 'Claim Agents' Offices Where Witnesses Are Bribed.

Regular Line of Training—List of 'Right' Jurors Drawn from Dives and Furnished By Keepers.

Invading the skyscraper buildings in which the Chicago City Railway and the Chicago Railways Company maintain 'schools for witnesses,' the state's attorney's investigators declare they have drawn a step nearer the fountain source of most of the jury-fixing, and a great deal of the graft that Mr. Wayman has started to destroy.

"For several hours yesterday the Wayman detectives searched the buildings at Dearborn and Monroe streets and La Salle and Monroe streets in which so-called 'business' offices are maintained as blinds, but which are in reality the quarters of the traction companies' claim agents.

It is expected these quarters will be shown to be the rendezvous of organized bands of jury-fixers, and that the claim agents and their henchmen will ultimately be revealed as the rats of the jury-fixing business.

"Keeping Witnesses in Good Humor.

"In the curriculum of the witness schools a leading place is given to a set of courses designed to 'keep the witnesses in good humor.' Facilities for amusements at cards are provided. There are special schools for women witnesses. In these the classes are mostly devoted to bridge whist. It is the regular practice to take the 'scholars' to theatres and gardens, and give them a royal good time so long as their testimony is likely to be useful.

"Hotel bills and traveling expenses are paid and liberal pocket money provided. When it is desirable

to have the witnesses close at hand they are taken out regularly to dine at the best restaurants.

"After receiving the latest reports from his investigators last night Mr. Wayman said:

" 'The jury fixing, with the corruption of all sorts that it involves, gets worse and worse as we progress. The only question is—how many persons are guilty?'

"DIVEKEEPERS RECRUITING AGENTS.

"It is expected that divekeepers who paid protection money to grafters in the police department will be shown to have recruited in the levees for the gangs of jury-fixers.

"The resort keepers are declared to have kept lists of habitues of their dives from whose number the 'fixed' juries were regularly drawn by the jury tamperers of the jury commissioners' office. For these lists of 'desirable undesirables' the interests benefited by the jury fixing paid a stated price. Thus the divekeepers have been able to recoup considerable of the losses sustained through payment of tribute for political and police protection."

That such an article, published in a newspaper of general and wide circulation, was well calculated to strongly prejudice the jurors against the defendant in the case, we think too clear to admit of question; and, while there is no intimation that the plaintiff was in any way responsible for the fact, its probable effect upon the jurors must have been exceedingly harmful. It is true, there is no positive and direct evidence that the jurors read the article, but we do not regard it as necessary that such a showing should be affirmatively made. In Meyer v. Cadwalader, 49 Fed. 32, a new trial was granted upon substantially the same showing that was made in this case without any direct evidence being offered that the jurors had read the objectionable matter. In passing upon the question the court said:

"It is idle to say that there is no direct evidence that the jury read these articles. They appeared in the daily issues of leading journals, and were scattered

broadcast over the community. The jury separated at the close of each session, and it is incredible that, going out into the community, they did not see and read these newspapers. That these public statements were well calculated to prejudice the jury against the plaintiffs and deprive them of a fair trial is a proposition so plain that it would be a sheer waste of time to discuss it. Good ground, therefore, here appears for setting aside the verdict."

In People v. Stokes, 103 Cal. 193, the court was considering the effect of similar newspaper publications upon a jury, and was passing upon the question whether or not it must be affirmatively shown that the jury were actually influenced thereby, and the court said that "the rule laid down by the foregoing cases, namely, that where an irregularity is shown that may have influenced the result, it is for the successful party to show as a matter of fact it did not, rests upon sound principles" (citing Section 27, Hayne on New Trials and Appeals).

In West Chicago Street Railroad Company v. Grennell, 90 Ill. App. 30, this court passed upon the probable effect upon a jury of an article seriously reflecting upon the railroad company, against which a verdict was recovered in the court below, and Mr. Justice Adams, delivering the opinion of the court, said: "The articles also plainly intimated that witnesses for appellant were bribed and were, for other reasons, unworthy of credit."

And, upon a showing that newspapers, containing the articles in question, came into the hands of the jurors, this court reversed the judgment of the court below, and said: "In short, the probable effect of the articles on the mind of the ordinary juror would be to prejudice him against the appellant and its witnesses, and to intimidate him, and swerve him from an impartial consideration of the case." * * * "It has been held in cases like the present, that direct evi-

dence that newspaper articles prejudicial to one of the parties were read by the jurors, or some of them, is not necessary to warrant the granting of a new trial; that it may be inferred from circumstances that the jury read the articles." * * * "That the reading by jurors of newspaper articles prejudicial to one of the parties is cause for a new trial, we regard as well settled. People v. McCoy, 71 Cal. 395; People v. Stokes, 103 *id.* 193; Cartwright v. The State, 71 Miss. 82; Walker et al. v. The State, 37 Tex. 366; Carter v. State, 77 Tenn. 440." * * * "No affidavits of jurors were produced denying the reading of the articles in question, although it is familiar law that the affidavits of jurors to sustain their verdict are admissible. We are of the opinion that on the affidavits in respect to the articles in question, the court should have granted a new trial."

Counsel for appellee, in the case at bar, does not, in his brief and argument, deny that the article in question would undoubtedly have a prejudicial effect upon the minds of the jurors. He made no attempt, in the court below, to show that the jurors had not read the article in question, though their affidavits to that effect were admissible, their tendency being to sustain their verdict. But appellee contends here that appellant was not sufficiently prompt in making objection to the trial court, but that it waited, speculating upon the verdict, before calling the court's attention to the situation. However, it appears from both the affidavits filed in this case, that it was not until just as the jury were retiring from the court room to consider of their verdict, that the affiants became aware that the jurors had in their possession copies of the paper containing the objectionable article, and, even at that moment, neither of affiants knew the character of the article in question. It is, therefore, difficult to see upon what ground we could hold that the prejudicial error was waived by appellant. We think the

court below committed reversible error in declining to set aside the verdict and grant a new trial.

As to the objections made to the rulings of the court below upon the admission and rejection of evidence, while we think that some of them are well taken, others are not, and none are of sufficient importance to justify extended comment in view of the fact that, upon another trial, it is altogether probable that the same questions will not be raised.

For the reason given, the judgment of the court below will be reversed, and the cause remanded for another trial.

*Reversed and remanded.*