(No. 43862.—

JO ANN RAINES, as special administrator of the estate of THOMAS RAINES, Appellant, v. NEW YORK CENTRAL RAILROAD COMPANY, Appellee.

*Opinion filed March 30, 1972.—Rehearing denied May 25, 1972.*

JAMES A. DOOLEY, of Chicago, for appellant.

LORD, BISSELL & BROOK, of Chicago (RICHARD O. OLSEN, ALVIN E. DOMASH and RICHARD E. MUELLER, of counsel), for appellee.

MR. JUSTICE WARD delivered the opinion of the court:

In an action brought under the Federal Employer's Liability Act (45 U.S.C., sec. 51 *et seq.*), a jury returned a verdict of $750,000 for the plaintiff, Thomas Raines, against the defendant, New York Central Railroad Company. The defendant had acknowledged its liability and trial was had to resolve only the question of damages. On appeal the Appellate Court for the First District reversed and remanded for a new trial (129 Ill.App.2d 294). We granted the petition of the plaintiff for leave to appeal.

On May 18, 1967, the plaintiff, who was 28 years of age, was severely injured while coupling air hoses between a locomotive and a box car in a yard of the defendant. At the time the plaintiff had been employed by the defendant for but nine days. The injuries necessitated the amputation of both the plaintiff's legs at points close to the hips, and he was continuously hospitalized from May 18, 1967, to August 18, 1967.

The defendant contended in the appellate court that the verdict was excessive and had resulted from jury passion and prejudice. It claimed that the trial court had erred in failing to instruct the jury that the plaintiff's award was not subject to income tax; that the trial court should have granted a mistrial or interrogated the jurors relative to a television program about personal injury lawyers which was shown during the trial and prior to the jury's retirement; that the introduction of evidence relative to the plaintiff's pension rights under the Railroad Retirement Act had he been employed until the vesting of such rights was improper; and that testimony of the

likelihood of a continuation of inflationary trends in the economy was erroneously admitted. The appellate court held that the trial court had committed error in allowing testimony relating to a continuation of inflationary trends and when it permitted the plaintiff to introduce evidence of retirement benefits he would have received had he continued to be employed by the defendant until retirement. The appellate court rejected the defendant's contention that the jury should have been instructed that the award was not subject to income tax and the court said that inasmuch as remandment for a new trial was to be ordered it would be unnecessary to consider the argument regarding the television program.

After we granted leave to appeal the plaintiff was killed, it would appear, in an automobile accident, and by order of this court Jo Ann Raines, as special administrator, was substituted as appellant and will hereafter be designated as plaintiff.

The same arguments the parties advanced in the appellate court are presented to us.

Considering the defendant's first contention, we judge that the trial court correctly refused an instruction that any award in favor of the plaintiff would not be subject to income tax. In *Hall v. Chicago and Northwestern Ry. Co., 5 Ill.2d 135, at 151-152,* this court observed: "It is a general principle of law that in the trial of a lawsuit the status of the parties is immaterial. Thus, what the plaintiff does with an award, or how the defendant acquires the money with which to pay the award, is of no concern to the court or jury. Similarly, whether the plaintiff has to pay a tax on the award is a matter that concerns only the plaintiff and the government. The tortfeasor has no interest in such question. And if the jury were to mitigate the damages of the plaintiff by reason of the income tax exemption accorded him, then the very Congressional intent of the income tax law to give an injured party a tax benefit would be nullified."

We are not persuaded by the defendant's second argument that the trial court should have interrogated the jury regarding the television program at the time it was reported by defense counsel to the court. The program, which was a network show, concerned trial lawyers. Six attorneys participated in the program, one of whom was a nationally known attorney specializing in personal injury matters. The discussants spoke of criminal trials and also contingent fees, influence of insurance companies on juries, and the personal injury lawyer told of large awards he had obtained. There was no reference to the plaintiff's case.

The following day the defendant's. attorney advised the court of the program and requested a mistrial. The motion was denied and a motion was then made that the jurors be polled to determine the program's influence, if any, which motion was also denied. However, after the jury had returned its verdict the trial court inquired.of the jurors as to whether any of them had seen the program. Three had seen the program but they stated it had not been discussed in the jury room. There is nothing to suggest the three jurors were influenced by their viewing the show.

We judge that the trial court correctly refused to poll the jurors as to whether they had seen the program at the time the request was first made by the defendant's attorney. To have done so would have only apprised those of the program who had been unaware of it and stimulated curiosity. After the verdict the court did poll the jurors and ascertained from the three who had seen it that it had not been discussed in the jury room. Considering the general character of the program and its remoteness from the case on trial, the trial court correctly considered that there had not been prejudicial influence. The motion for a mistrial was addressed to the trial court's discretion and the court did not err in denying it.

In the cases offered by the defendant to support its

argument, the prejudicial character of the matters involved seemed clear. In *West Chicago St. R.R. Co. v. Grenell, 90 Ill.App. 30, 45,* a newspaper article stated that the jury " *** on the former trial had been bribed," and that " *** the case [was] to be given another chance for 'justice'." In *Trohey v. Chicago City Ry. Co., 168 Ill.App. 1,* two jurors brought into the jury room a newspaper which contained an article suggesting that defendant had engaged in jury tampering. In *Day v. Thomson, 305 Ill.App. 29,* the article reported prejudicial remarks by a trial judge regarding the good faith of defendant's attorneys. The three criminal cases cited, *People v. Hryciuk, 5 Ill.2d 176; People v. Malmenato, 14 Ill.2d 52; People v. Cox, 74 Ill.App.2d 342,* involved prejudicial comments about the accused.

The contention that the trial court erred in admitting evidence of pension rights the plaintiff would have enjoyed under the Railroad Retirement Act had he continued to work for the defendant is not well founded. To illustrate these benefits, an employee of the Railroad Retirement Board, Emil J. Oravec, testified that an employee, after ten years of railroad service, would become eligible for retirement benefits. Oravec testified that at the time of trial the maximum retirement benefits payable to a retired railroad employee with thirty years of service was $247 per month. He said that according to official projections, on the basis of average earnings of $650 per month, and reckoning from the time of trial, a railroad employee who would retire after thirty-five years would receive $502 per month plus a $70 supplement. The supplement, however, was at the time of trial being provided on a five-year trial basis and its continuation was uncertain.

The appellate court held, erroneously, we consider, that this evidence was too speculative to have been admitted. The authorities offered by the defendant to support the appellate court's view did not involve the issue we consider. In *Eichel v. New York Central R.R. Co., 375*

*U.S. 253, 11 L.Ed.2d 307, 84 S.Ct. 316,* which was relied on by the appellate court, the Supreme Court held that the trial court properly excluded evidence that the plaintiff was receiving a disability payment of $190 per month. The decision does not have force here, however, for the evidence had been offered by the defendant to show that the plaintiff's failure to return to work was due to malingering. The other cases advanced by the defendant *(Sinovich v. Erie R.R. Co. (3rd cir. 1956), 230 F.2d 658; Hetrick v. The Reading Company (D.C.N.J. 1941), 39 F.Supp. 22; Riley v. West Virginia Northern R. Co. (1948), 132 W.Va. 208, 51 S.E.2d 119; Missouri Pacific R.R. Co. v. Wellingham (Tex.Civ.App. 1961), 348 S.W.2d 764; Gilroy v. Erie-Lackawanna R.R. Co. (S.D.N.Y. 1968), 279 F.Supp. 139;* and *New York, New Haven & Hartford R. Co. v. Leary (1st cir. 1953), 204 F.2d 461)* are to the effect that a defendant may not mitigate damages by introducing evidence of the plaintiff's pension rights. They are not relevant here.

Raines offered the evidence of his lost pension rights in proof of the injury inflicted on his future earning capacity. The trial judge instructed the jury that plaintiff was entitled to the "present cash value of earnings reasonably certain to be lost in the future." The defendant made no objection to the instruction and does not quarrel with the measure of damages proposition the instruction embodies. The plaintiff argues that the pension rights he would have acquired under the Railroad Retirement Act are a part of the remuneration for continued employment with the railroad, that these benefits would have vested after ten years employment, and that he was forever deprived of them. Neither party cites a Federal Employer Liability Act case where the propriety of introducing lost pension rights as an element of damages was decided, but we note that in *Boston and Maine R.R. v. Talbert (1st cir. 1966), 360 F.2d 286,* the court in rejecting the defendant's contention that damages awarded to plaintiff were

excessive, noted that: "[A] t age sixty-five he would have retired with a pension of $287.00 a month for the rest of his life and could have supplemented this amount by other employment." (360 F.2d 286, at 291.) In other actions for personal injuries, courts have held that the introduction of lost pension rights is a proper element of damage. The Court of Appeals for the second circuit in *Cunningham v. Rederiet Vindeggen (2d cir. 1964), 333 F.2d 308,* applying *Healy v. Rennert (1961), 9 N.Y.2d 202, 213 N.Y.S. 44, 173 N.E.2d 777,* held that evidence of lost pension benefits was admissible. In *Groat v. Walkup Drayage and Warehouse Co. (1936), 14 Cal.App.2d 350, 58 P.2d 200,* the court, in approving the admission of evidence of lost pension rights, said: "Although, at the time of the accident the accrual of respondent's right to a pension was contingent upon his further service for four years, and the amount that he would receive depended upon his subsequent length of life, yet he then had a present existing right to fulfill such contingencies, and any interference with his ability so to do constituted an invasion of such right. This right to mature a pension is somewhat analogous to the right of a person to work and earn in the future. Loss of future earning capacity has always been considered a proper element of damages. [Citations.] Respondent's loss of a future pension because his injuries terminated his employment four years before his right to a pension accrued was therefore a proper element of damages." 14 Cal.App.2d 350, 358, 58 P.2d 200, 204.

The record shows that the plaintiff had a contingent right to pension benefits under the Railroad Retirement Act, which would have vested had he continued his employment for ten more years. Where the plaintiff had a presently existing but contingent right to a pension, evidence of that right was admissible to show part of his damages for loss of future earnings. Raines had testified that he intended to continue railroading, and it was for the jury to weigh this testimony.

The appellate court also held that the evidence of pension rights was inadmissible, as "this evidence was duplicative of other testimony which sought to compensate the plaintiff for lost wages over his life expectancy of 42.8 years, which would encompass his projected years of retirement." (129 Ill.App.2d at 305.) We do not think this observation was correct. There was, of course, no error in the admission of evidence of the plaintiff's life expectancy, and the defendant had introduced evidence that the plaintiff was likely to work for fewer· years than his life expectancy.

Defendant's last contention is that the "verdict resulted solely from the jury's deep and understandable sympathy for the plaintiff and prejudice against the defendant railroad inflamed by plaintiff's counsel's incessant play on the jury's fear of inflation." The plaintiff had called Dr. John P. Henderson, a professor of economics at Michigan State University and labor economist, to testify that the economy was in an inflationary spiral, which in his opinion would continue. Defendant's counsel objected to this testimony on the sole ground that it was too speculative.

The witness, over objection, testified that on the basis of data compiled by the United States Department of Labor, the general trend of prices and wages in the United States from 1946-1966 was upward, and that the wages paid nonsupervisory railroad workers had increased an average of 5.3% per year, from $50 per week in 1946 to $135.65 per week in 1966. He testified that persons on fixed incomes were hurt more by price inflation than employed persons who could work. He stated that, in his opinion, price inflation would continue.

Edward McKinney, an investment banker, testified for the plaintiff that the buying power of the dollar had declined substantially from 1940 to 1967, so that the 1940 dollar had a value of $.42 in 1967. He also testified that we are in a high interest rate period, that interest rates

have increased markedly since 1946, and that the increase is indicative of the inflationary spiral. His opinion was that this inflationary spiral would continue.

Two witnesses, an actuary and an investment adviser, were called by defendant to testify to the rate of return presently available to an investor required to live from the proceeds of his investment. They apparently did not testify in rebuttal but were called as witnesses to the extent of plaintiff's loss of future earnings. Neither witness said, when cross-examined, that he considered inflationary forces when advising as to income producing investments.

The appellate court concluded that "the testimony prejudiced the jury in their deliberations." (129 Ill.App.2d 292, 304.) However, the court did not hold, as the plaintiff vigorously argues, that the verdict was excessive.

Without acknowledging error in the admission of the evidence regarding inflation, the plaintiff contends, citing *Swigert v. Chicago B. & O. R.R. Co., 208 Ill.App. 98, 100; Slovinsky v. Beasley, 316 Ill.App. 273,* and *Aledo Terminal Ry. Co. v. Butler, 246 Ill. 406, 410,* that reversal, if the admission of the evidence was improper, is called for only if the verdict was excessive and in this case the verdict was not excessive. The defendant would distinguish these cases on the ground that, although the courts there found harmless error, they did so because the appellant did not question the verdict as excessive. Here the defendant maintains that the verdict is excessive, and that its excessiveness is a consequence of the introduction of evidence of inflation. It has not, however, called attention to any decision holding that the simple assertion that damages are excessive precludes a finding of harmless error, even though the verdict is supported by other proper evidence.

This court in *Stoddard v. Illinois Improvement and Ballast Co., 275 Ill. 199, 205,* refused to reverse a verdict in the plaintiff's favor for breach of a contract, because

"the error was entirely harmless and did plaintiff in error no damage, as the small verdict of $2,500 damages clearly showed." In *Peoria, Atlanta & Decatur R.R. Co. v. Sawyer, 71 Ill. 361, 363,* where the plaintiff had sued for damages to land owned by him, it was held that error in the admission of evidence showing injury to the plaintiff's other land did not require reversal, since the award for the damage to the land injured by the defendant had ample support in the record. In neither *Stoddard* nor *Sawyer* did the court rest its refusal to reverse on the ground that the defendant had not claimed the damages were excessive. Other courts have not considered erroneously admitted evidence going to the extent of damages as reversible error where other proper evidence in the record supported the verdict, regardless of any claim by defendant of excessive damages. *(Western Fire Insurance Co. v. Woods (1968), 165 Colo. 169, 437 P.2d 547; Pattison v. Pattison (1952), 207 Okla. 46, 247 P.2d 514.)* In *Pattison,* for example, where the plaintiff sued for conversion, the court first held, contrary to the defendant's contention, that the evidence was sufficient to support the verdict. It then observed, "***had the trial court excluded the evidence objected to it is apparent that the result would have been the same. The error, if any, in admitting the evidence to which defendant objected is therefore harmless." 247 P.2d at 515.

We judge that if there was other proper evidence here sufficient to support the verdict, it will be unnecessary to examine the validity of the defendant's contention that the admission of evidence regarding future inflation resulted in an excessive verdict.

In considering the other support for the verdict we observe that the case was submitted to the jury with instructions to compensate plaintiff for six categories of damage. Included were the nature, extent and duration of the injury; the disability and disfigurement resulting from

the injury; the pain and suffering experienced and reasonably certain to be experienced in the future as a result of the injuries.

There was extensive medical testimony regarding these elements of damage. Dr. William McNabola, a physician retained by the railroad, testified on behalf of the plaintiff. He stated that he first saw the plaintiff when he was brought to St. Bernard's Hospital at 6:50 P.M. on May 18, 1967, the date of the injury. He said the plaintiff's right leg had been severed through the central portion of his thigh. His left lower leg had not been completely severed, but remained partially attached through some muscle tissue behind the femur or thigh bone. Both leg wounds were extensively contaminated with cinders and dirt. At his admission to the hospital it was found that his blood pressure had dropped drastically, so that it was necessary to take steps to raise the pressure by the injection of various intravenous fluids and the application of tourniquets to what remained of his thighs. Dr. McNabola testified that he had called Doctors Meany and Governale in consultation. On the advice of Dr. Governale, a specialist in vascular complications, the left leg was removed on the night of May 18. Dr. Governale had advised severance because of the extensive crushing, contamination and consequent infection of the leg, which created a serious risk of gas gangrene. Between May 18 and July 10 the plaintiff underwent eight separate operations for the removal of dead bone and other tissue and procedures for the placement of split-thickness skin grafts over the open wounds. The skin for the grafts had a tissue paper diameter, and was taken from the plaintiff's upper thigh and abdomen.

Dr. Robert P. Meany, an orthopedic surgeon, testified that he had continued to treat Raines up to the time of trial. He said that after the plaintiff's admission to St. Bernard's on May 18, he had developed a toxic condition from the absorption of dead skin. This toxicity made him

semi-comatose. Between May 18 and May 21 his temperature was highly elevated, reaching 105 degrees at times. His stumps became infected and the infection was so severe, Dr. Meany testified, that it was necessary to apply Dakon's solution, a medicated solution containing chlorine. Dakon's solution, which disinfects and promotes healing tissue, is an irritant and causes pain when put on a raw, sensitive area.

During the plaintiff's stay at St. Bernard's, Dr. Kurth, a specialist in skin grafting, performed several operations, covering the raw areas with split-thickness skin grafts. The aim was to prevent the loss of body fluids, and to promote healing. The effect of removing skin from plaintiff's abdomen, hips and thighs for the graft was to leave these areas raw and painful.

The plaintiff required continuous nursing services. Dr. Meany testified that the plaintiff had experienced intense pain. The slightest movement of the stumps would cause pain, so that it was necessary to use sandbags as splints. The severity of pain was sometimes manifested by an involuntary, spasmodic jumping of the stumps.

Raines also suffered what Doctors Meany and McNabola called phantom pains—that is, even though the legs were severed, he complained of pain in his feet and toes. Phantom pains are not uncommon in these kinds of amputations, Dr. Meany testified, and result from the cutting of the femoral and sciatic nerves, which have their origin in the spinal cord.

Dr. Meany testified that he continued to treat the plaintiff after July 24, 1967, when he was transferred to the Little Company of Mary Hospital. The infection and drainage from the stumps continued, though less severely, at Little Company of Mary, where he remained until August 18, 1967.

Dr. Meany last examined the plaintiff two or three weeks before trial, which began on April 23, 1968. He found evidence of continuing infection in the left stump.

The witness was unable to estimate how long the infection might persist. stated that the patient required further treatment which would necessitate further hospitalization. The further treatment would be to clear up the infection and to shorten the stumps in an effort to get soft pliable skin over them preparatory to an attempt to fit the plaintiff with a prosthesis.

Dr. Horace E. Turner and Dr. Wayne Slaughter also testified in behalf of the plaintiff. Dr. Turner, an orthopedic surgeon with experience in the treatment of amputees, testified that he had examined him approximately one week before the trial, and he had taken certain X rays, which were introduced into evidence. The pictures showed that approximately four inches of right thigh bone and 3—1/2 to 4 inches of left thigh bone remained. They also showed a sequestra, indicating an osteomyelitis. He stated that osteomyelitis heals very slowly, and that it was possible the patient's condition would be permanent. Spurs also appeared on the left femur, and failure to remove them, he stated, would reduce the chances of clearing the infection and would cause pain if the plaintiff were to be fitted with a prosthetic appliance. Before the plaintiff could be fitted with prostheses, it would be necessary to further revise both stumps, and bring soft tissue down over them by traction. In Dr. Turner's opinion the split-thickness grafts then on the stumps would not bear the weight of a prosthesis. When asked whether he knew of cases where an artificial limb was placed on an area where the bone protruded, he stated that although he had seen and heard of such attempts, he had never seen it done successfully.

Dr. Turner further testified that the usefulness of an artificial limb is proportional to the length of the stump on which it is placed, and one cannot readily move the appliance with stumps as short as those of the plaintiff. Given the extent of this amputation, a prosthesis on the right leg would be useless. At best, the witness said, the

plaintiff would always be obliged to use crutches to retain his balance, and he would always suffer some pain. He would periodically have to have the prostheses changed.

Substantially the same medical opinion was given by Dr. Slaughter, who is the chairman of the Department of Plastic Surgery at Loyola University Stritch School of Medicine. He stated that in his work he has contact with paraplegics and amputees, and is in charge of a ward of amputees and paraplegics at the Hines Veterans Administration Hospital. He had examined the plaintiff on April 1, 1968, and concluded that he had osteomyelitis in the left stump which would have to be cleared up before he was fitted with prostheses. In addition, both stumps would have to be further shortened, and traction applied so as to bring down full thickness, weight bearing tissue. In his opinion, split-thickness grafts, which are only 10/1000 to 16/1000 of an inch and contain no subterraneous fat, would not support a prosthesis. At most, in his opinion, the plaintiff could hope for only limited mobility.

The only medical witness to testify for the defendant was Dr. Robert G. Thompson, a specialist in orthopedic surgery and consultant to the Rehabilitation Institute of Chicago. He had examined the plaintiff twice, the first time as consultant and the second time in preparation for trial. At the request of the defendant Dr. Thompson had seen the plaintiff in July, 1967, at St. Bernard's Hospital. At that time he recommended his transfer to the Chicago Wesley Memorial Hospital, where he planned to perform further surgery. He intended to transfer the plaintiff later to the Rehabilitation Institute, so that "*** hopefully, we could fit him for a prosthesis and start him on his ambulation training."

On July 24, 1967, plaintiff was transferred to Wesley where he remained less than 24 hours. The witness did not see him that day, but had a telephone conversation with him. He testified that the patient expressed displeasure at having been placed in a ward without air-conditioning, and

said that he wished to remain under the care of Dr. Meany. Dr. Thompson had suggested that he communicate with Dr. Meany, which plaintiff had done and had been transferred to the Little Company of Mary Hospital.

Dr. Thompson next saw the plaintiff in his office on April 1, 1968. He testified he found that the right stump had healed except for one small area where the bone was slightly eroded, but that it was not infected. The left stump was not completely healed and would require further shortening. He also observed some drainage from the left stump, but in his opinion this evidenced only a surface infection. On cross-examination, however, he said he had not taken any X rays of the plaintiff's stump. Sequestra appearing in an X ray of stumps, he admitted in response to a question, was one of the "classical findings" of osteomyelitis.

On the basis of his examination of April 1, it was Dr. Thompson's opinion that the plaintiff could be fitted with a prosthesis on his right stump and could begin standing between parallel bars. The left side, however, had not healed sufficiently to accept a prosthesis. He stated that the plaintiff could be fitted with prostheses on both legs approximately three or four months after both stumps had healed. This would be a new type of prosthesis, a socket-type, which is held on by means of a belt around the waist. At most, the plaintiff could hope to walk in and out of the bathroom and other short distances with the assistance of two canes, and get in and out of a wheel chair. The witness admitted that split-thickness grafts do not furnish a good basis for a prosthesis, and that they have a tendency to break down. Another obstacle to fitting the plaintiff with a prosthesis was the flexion contracture he suffered, a condition in which the hip is drawn upwards towards the abdomen.

Relative to the reasonable expense of prior medical care of the plaintiff and the present cash value of medical treatment reasonably certain to be received in the future,

the record shows that until July 24, 1967, when plaintiff transferred to the Little Company of Mary Hospital, the defendant paid for his medical treatment. From July 24 until trial, the plaintiff had incurred medical expenses of $3,647.84. The cost of immediately necessary future surgery, Dr. Turner testified, would be $1,000 for the left leg and $500 for the right one; future medical attention, hospitalization, and medical care would run the plaintiff "well over $50,000."

On the question of the value of earnings lost and the present cash value of future earnings lost, there was no evidence of the plaintiff's rate of compensation. However, for the days he actually worked between May 9, 1967, and May 18, 1967, he had earnings of $330.56. Dr. Henderson, the economist, testified that this would amount to a rate of $275.45 for a 5-day week, which projected 48 weeks to the date of trial, totaled $13,221.60.

Bernard Glynn, who was the local chairman of the Brotherhood of Railroad Trainmen at the Englewood yard, where the plaintiff worked, testified that he could have averaged three to six hours of overtime work per week had he continued in his employment.

Both the parties introduced testimony to ascertain the present cash value of plaintiff's anticipated future earnings. Witnesses testified to the amounts needed to return $1,000 for differing number of years at rates of 4%, 5% and 6%. The estimates ran from $20,548.94 at 4% for 41.8 years (plaintiff's life expectancy) to $14,787.29 for 34.14 years (his expected work life) at 6%. According to the various witnesses, the evidence was that the present cash value of the plaintiff's future earnings was approximately $185,000 to $225,000.

There was evidence that after the plaintiff was released from the hospital, a friend, James Elmund, moved into his home in order to assist him. The plaintiff's wife was a slightly built woman of 105 pounds, and plaintiff testified that Elmund had to help him in and out of bed,

to the front room chair, to the bathroom and up and down stairs. Both Raines and Elmund testified that Elmund had come to live with Raines at his request, and that Elmund was forced to quit his employment at the American Metal Decorating Company, where he was earning $125 per week. Elmund had lived continuously in the plaintiff's home since August 18, 1967, and Elmund testified that it appeared necessary for him to live there, as the plaintiff could not care for his three children when his wife was absent. He testified that he had originally gone to live with Raines out of friendship, but that the plaintiff had desired to pay him for his services. At the time of the trial he had not received any compensation.

Relative to future nursing care, there was evidence that the plaintiff would require assistance throughout the remainder of his life. Dr. Turner testified that he would have toilet problems and would need someone to assist him in getting in and out of bed.

Considering the evidence presented, including that of loss of anticipated earnings for a lifetime, of the pain and suffering, of the grievous nature of the injuries, of the anticipation of certain discomfort and expenses, and of the prospect of only minimal restoration, we judge that, apart from any evidence of the diminution of the award through inflation, the verdict was amply supported. The award was high but the claim of excessiveness is not warranted. The reliance one can place on comparisons is somewhat tenuous, but we would note that in *Moore v. Jewel Tea Co., 46 Ill.2d 288,* a $900,000 award to a housewife who was blinded was not questioned as having been excessive. One cannot certainly assess in financial terms these human tragedies, but one can conclude that the award here was not excessive.

For the reasons given, the judgment of the Appellate Court, First District, is reversed and the judgment of the circuit court of Cook County is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*